GRAY *v.* CAMERON.

4-9326 234 S. W. 2d 769

Opinion delivered December 18, 1950.

Rehearing denied January 15, 1951.

*Crumpler & Eckert,* for appellant.

*McKay, McKay & Anderson,* for appellee.

GRIFFIN SMITH, Chief Justice. In 1944 A. A. Cameron leased from R. E. Thomas and his wife 35 acres on the north edge of the Haynesville oil field in Columbia

county. When Thomas died in 1945 his wife acquired by will the interest her husband had in the property. She married again and is now Martha Gray, the appellant.

In December, 1942, the Arkansas Oil and Gas Commission limited drilling in this field to a well to eighty acres, to be within 100 feet of the center of a north-south drilling unit. To meet this requirement as to some of the land affected by leases in litigation here it was necessary to unitize. An agreement to this effect was executed April 29, 1946. The operational area is designated as the Reed-Biddle Unit. Thomas had owned forty acres when the Cameron lease was consummated, but five acres in the southeast corner had been leased to another.

A producing well, or "pumper," was completed on the unitized 80. Since other acreage in the drilling tract is not involved in this suit we mention only the matters affecting appellant's claimed rights.

Only 8.81 acres of the Thomas-Cameron lease became a part of the Reed-Biddle Unit for the purpose of apportioning production. This left 26.19 acres of the leased 35 beyond the unitized boundary; but, as the proof shows, subject in some slight degree to distant drainage into the producing well, accountable oil came from the 80 acres. Payment was in proportion to the acreage or other interest each participant's contribution bore to the whole. Result is that appellant is compensated in the proportion 8.81 bears to 80, with no allowance for the non-included area of 26.19 acres.

Mrs. Gray sued in January, 1950, to cancel that part of the lease not within the 80 acres, and for $20,000 as damages. The Chancellor found that the unitization agreement, in consequence of which the producing well was drilled, supplemented the 1944 lease and expressly retained control of the acreage in dispute.

The original lease was executed with knowledge that rules of the Oil and Gas Commission did not allow drilling on the grant, for there is the provision that the acreage might be merged with adjoining tracts sufficient to constitute a drilling unit. In that event the lessor would

share ratably in the royalty payments applicable to the entire unit "in the proportion which the acreage in the tract herein conveyed bears to the entire acreage contained in the drilling unit."

If this were all there would be substance to a claim that appellant should share in production from the 80 acres under a 35-80 ratio. But it is not all. Others owning leases or royalties in this area—a field thought by experts most likely to produce oil and gas in paying quantities—joined with appellant in unitization. The agreement was in response to proposals by Skelly Oil Company and others. The unitization agreement recites ownership of the 26.19 lease and the interests of others. There is reference to Blain Dunbar's ownership "of a certain oil and gas lease dated May 12, 1944, [the Thomas-Cameron transaction] covering, among other lands, [the south 13.81 acres less five acres formerly sold] which lease was duly recorded," etc.

The unitization contract affecting leases, royalties, and overriding royalties, provides that operations carried on [in good faith] or continued production shall prevent lease forfeitures, irrespective of *where* on the 80 acres the primary undertaking occurs. The language is: "Drilling or production shall be taken and accepted as drilling, producing, and lease operations under the terms of each and all of the oil and gas leases referred to above, and such operations . . . on any part [of the unitized area] shall have the same effect as if such operations . . . had been done on, or such production obtained from, each and all of the tracts in said communitized area, to the end that such operations . . . shall continue all of said oil and gas leases above mentioned in full force . . . as to all of the lands covered by this communitization agreement, and as to all of the other lands covered by any and all of said leases so long as there may be . . . production on the communitized area."

The effect of this agreement is twofold. It provides that "operations for drilling"—a term no doubt

well understood in the oil fields—or [actual] drilling or production on any of the unitized area shall continue the leases as to acreage within the unit; but, secondly, the leases shall continue "as to all other lands," etc.

The testimony and stipulated facts may be briefly summarized. A professional lease buyer would pay $35 per acre ($916.65) for a lease on the outside land. A geologist whose competency was conceded could not say, with a fair degree of certainty, how much oil was being drained from the subject acreage.

Production comes from the upper petit lime at a depth of 5,608 to 5,622 feet. The producing well cost $50,000 and the yield lacked $24,000 of having reimbursed those who financed the venture. Pump production had averaged 14 barrels a day with prices ranging from $1.20 to $2.40. The well is separated from appellant's land "by a forty," but drilling was not in the exact center of the 80-acre tract.

Appellees argue that with production gradually dwindling (estimating current pipeline deliveries at twelve barrels per day as distinguished from the 1946-'49 average), the half of an eighth royalty appellant owns in the subject matter would amount to about 64c per day if oil sold at $2.60 a barrel. It is stipulated that a geologist familiar with the Haynesville field would testify that a prudent person would not drill to the petit lime as a north offset to the Reed-Biddle Unit.

It is not convincingly shown that damages should have been awarded for failure to develop. Under rules of the Oil and Gas Commission a well could not be put down on the small tract, and nothing in extenuation is shown.

In *Ezzell* v. *Oil Associates, Inc.,* 180 Ark. 802, 22 S. W. 2d 1015, it is said that the forfeiture of a lease will be allowed when that course is supported by the principles of equity and such relief is essential to the public and private interests in the development of mineral lands, "and where such forfeiture does not contravene plain and unambiguous stipulations in the lease."

The lease form used in the Thomas-Cameron transaction, known as Form No. 88, was discussed in *Poindexter* v. *Lion Oil Refining Co.*, 205 Ark. 978, 167 S. W. 2d 492. Ezell's case was cited, where the area in controversy involved 1,170 acres. In addition to the contractual feature of the case at bar, facts in the Poindexter litigation differ from those here. Poindexter demanded that offset wells be drilled when it became evident that large production from adjacent properties was causing substantial drainage. In the field where Poindexter had interests rules permitted a well to each forty acres. The defendant there very frankly admitted that it wanted to hold the lease in the hope that some other operator would discover oil by drilling to an unknown formation. If a speculative venture of this kind showed that the plaintiff's lands should be drilled, there would be a fair chance of profit. Production from the operating wells was large compared with production from the unitized 80 here. The opinion says:

"Oil has been and is now produced in more than paying quantities upon the land immediately adjoining the leased premises, the wells being as close to it as the rules of the commission will permit. The probability of substantial drainage has been proved. . . . There is no comparison . . . between the amount of royalties the lessor would receive in the event there was production and the mere pittance which he is entitled to as delay rentals."

But even in the Poindexter case the defendant was allowed six months within which to begin drilling on the disputed acreage as an alternative to cancellation.

Should it be conceded—a matter we do not decide—that ambiguous language characterizes some parts of the unitization agreement, the overall purpose was to guarantee a well for the benefit of all whose acreage was involved. It is not suggested that fraud or undue influence was exerted or that anyone was overreached; there-

fore we cannot read out of the final contract ''all of the other lands covered by any and all of said leases.''

Affirmed.

Mr. Justice GEORGE ROSE SMITH dissents.