Frank M. BRIXEY and Lyda M. Brixey, Plaintiffs,

v.

**UNION OIL COMPANY OF CALIFORNIA (Successor to the Pure Oil Corp.), Defendant,**

Gulf Oil Corporation, Intervenor.

Civ. A. No. 2098.

United States District Court
W. D. Arkansas,
Fort Smith Division.

April 24, 1968.

See also D.C., 275 F.Supp. 290.

Sam Sexton, Jr., Fort Smith, Ark., Wayland Parker, Greenwood, Ark., for plaintiff.

Roger K. Allen, Oklahoma City, Okl., Hardin, Barton, Hardin & Jesson, Ft. Smith, Ark., for Gulf Oil.

Vinson, Elkins, Weems & Searls, Houston, Tex., Warner, Warner, Ragon & Smith, Ft. Smith, Ark., for Union Oil.

## OPINION

JOHN E. MILLER, Senior District Judge.

This is an action for ejectment and damages.

The case was tried to the court, without the intervention of a jury, on February 27, and 28, 1968. At the conclusion of the plaintiffs' evidence in chief, the intervenor, Gulf Oil Corporation, submitted a motion for judgment in its favor. Ruling on the motion was deferred, and at the conclusion of all the evidence the court denied the motion. The case was submitted, and the parties have submitted voluminous briefs in support of their contentions.

Notwithstanding the length of the briefs, the material issues are few and not difficult of resolution.

For a better understanding of the issues the court believes that an abstract of the oil and gas lease, under which the defendant purportedly holds, and the pleadings should be set forth.

### Lease

On March 6, 1957, plaintiffs executed and delivered to The Pure Oil Corporation (which later became Union Oil Company of California) an oil and gas lease on the following described lands:

Counties of Logan and Sebastian, Arkansas:

T 6 N, R 28 W—Section 6, SW¼
           Section 7, NW¼ NE¼ and N½ NW¼,

T 6 N, R 29 W—That part of the NE¼ NE¼ lying East of a Line 100 feet East of the Center Line of Rattle Snake Canyon Road in Section 12, in Sebastian County, Arkansas.

———◆———

The lease was for a period of ten years "and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or either of them is produced from said land, *or from lands with which said land is pooled * * *."* (Emphasis added.)

The pooling clause of the lease reads as follows:

"Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said lease premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises, such pooling to be of tracts contiguous to one another and to be into a unit or units not exceeding 45 acres each in the event of an oil well, or into a unit or units not exceeding 660 acres each in the event of a gas well; or Lessee may, at its option and without Lessor's joinder, pool or combine the acreage covered hereby, or any portion thereof, with other land, lease or leases so as to establish a cooperative or unit plan, or plans, of development which would include land owned by the United States, regardless of size of such unit, following certification of such plan or plans by the Secretary of the Interior. Lessee shall execute in writing and record in the conveyance records of the county in which the land herein leased is situated an instrument identifying and describing the pooled acreage. *The*

*entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not.* In lieu of the royalties elsewhere herein specified, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved." (Emphasis added.)

The lease further provided:

"Should any well drilled on the above described land, or on acreage pooled therewith during the primary term and prior to production being obtained, be a dry hole, or if, after production is obtained, the same should cease from any cause during the primary term, then if a further well is not commenced on said land, or on acreage pooled therewith or reworking operations to restore such production have not been commenced, prior to the next ensuing rental paying date, this lease shall terminate as to both parties, unless the lessee on or before such rental date shall resume the payment of rentals, in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals as above provided, that the provisions hereof governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments, and if the lessee shall commence to drill a well within the primary term of this lease on the land above described, or on acreage pooled therewith, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil, gas, casing-head gas, casinghead gasoline, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the primary term. Should production from the above described land, or from acreage pooled therewith, cease from any cause after the expiration of the primary term this lease shall not terminate provided lessee succeeds in bringing back such production within six (6) months from such cessation, *or within such six (6) month period commences drilling another well on the above described land or on land pooled therewith, and prosecutes the drilling thereof with due diligence to completion,* and if such production is restored through any such operations this lease shall continue with the like effect as if there had been no cessation thereof." (Emphasis added.)

### Pleadings

On October 29, 1966, the plaintiffs commenced an action, No. 3427, in the Chancery Court of South Logan County, Arkansas, by filing their "Complaint in Equity" against The Pure Oil Corporation. In their complaint they alleged that they had executed and delivered to The Pure Oil Corporation the lease heretofore referred to, which lease had been placed of record in the Lease Records of South Logan County, Arkansas; that on some date prior to March 1963, the Gulf Oil Corporation caused a gas well to be drilled and placed in production, the same being referred to as the Peacock Unit and composed of all of Section 7, Township 6 North, Range 28 West, containing 698.72 acres; that the lands belonging to the plaintiffs located in said section were included in that unit, and royalty on the gas produced from said unit had been and was being paid to the plaintiffs.

Plaintiffs alleged that the defendant has refused and failed to drill offsets to the producing gas well and has refused to explore or develop plaintiffs' lands and has refused to pay delay rentals on said lands; that the plaintiff Frank M.

Brixey "notified the defendant that no payment was being made on any lands except those in Section 7, Township 6 North, Range 28 West and demanded that the leases be forfeited or delay rentals be paid; that the defendant, The Pure Oil Corporation, replied by mail stating it was holding all of the lands covered by the above described lease by the production in Section 7, Township 6 North, Range 28 West and refused to either pay delay rental or to commence operation; that more than a reasonable time has elapsed without operations having been commenced and plaintiffs allege they are entitled to have the lease cancelled and all other instruments that constitutes a cloud on plaintiffs' title either cancelled or held to be subsequent and subservient to the rights of the plaintiffs herein."

The defendant Union filed its answer in which it denied each and every material allegation contained in plaintiffs' complaint. A copy of the answer was served upon Karl D. Glass, Booneville, Arkansas, the attorney of record for plaintiffs.

On August 10, 1967, the intervenor, Gulf, with permission of the Chancery Court, filed its intervention, in which it alleged:

"II.

"The intervenor at all times herein material is and was the owner of interests in oil and gas leasehold estates situated in Section 6, Township 6 North, Range 28 West, Logan County, Arkansas. On or about the 24th day of January, 1967, the intervenor entered into negotiations with the defendant for a farm-out of defendant's lease from the plaintiffs covering the Southwest Quarter, Section 6, Township 6 North, Range 28 West, Logan County, Arkansas. Intervenor sought its interest in the leases covered by said farm-out agreement for the purpose of creating a drilling unit consisting of all of said Section 6 for the drilling and operation of a gas well in the Atoka Formation as permitted by

the oil and gas leases covering said section including the lease described in plaintiffs' complaint. * * *

"III.

"That during the period of the negotiations with the defendant the existence of the present lawsuit was discovered by the intervenor. Both the defendant and the attorneys of record for the plaintiff were advised that the intervenor was seeking a farm-out of the lease in question on the Southwest Quarter of said Section 6, but that it would not accept such a farm-out until the instant litigation had been settled or otherwise disposed of. * * * *"

In paragraph IV of the intervention, Gulf alleged:

" * * * That by virtue of the farm-out agreement and the work undertaken pursuant thereto, the intervenor has an equitable interest in the lease between plaintiffs and defendant as to the Southwest Quarter of Section 6. In accordance with the agreement reached between the plaintiffs and the defendant the intervenor commenced operations for the drilling of a well at a legal location as permitted by the Arkansas Oil & Gas Commission in Section 6 on the 10th day of July, 1967. As of the seventh day of August, 1967, the intervenor has drilled the well to a depth of 2359 feet and drilling operations are continuing."

"V.

"That by reason of their conduct, actions and inactions, plaintiffs are estopped to deny the agreement reached between the plaintiffs and the defendant and the dismissal order entered by the Court. The intervenor acted in good faith upon said agreement and dismissal order with knowledge of the plaintiffs and/or their attorney of record and authorized agent. Plaintiffs therefore are estopped to continue this action to the prejudice of the intervenor or to assert any claims that the lease covering the Southwest

Quarter of Section 6 has been abandoned or that the non-productive portions thereof have terminated or that the plaintiffs are entitled to cancellation thereof for any cause or pursue any other actions which would be to the detriment of this intervenor. Intervenor specifically pleads the equitable defenses of estoppel, laches and waiver as a complete bar or defense to any claim of the plaintiffs that the lease as to the lands in Section 6 should be cancelled."

On Septmber 15, 1967, one month and five days after the filing of the intervention, the plaintiffs filed an amended complaint in which they adopted, affirmed, and ratified the allegations of the original complaint, and further alleged: That on the cessation of the Peacock unit to produce gas in paying quantities, the oil and gas lease executed by plaintiffs to defendant thereafter expired by its own terms on March 6, 1967; that the defendant had a statutory duty to release of record the lease, and that written demand, coupled with the plaintiffs' commencement of this action, gave the defendant actual notice as required by the statutes of Arkansas that such oil and gas lease be released; that during the drilling operation of Gulf on a unit, of which the land in Section 6 was a part thereof, there was a substantial show of gas; that such show of gas immediately gave great value to the plaintiffs' oil and gas leasehold on the SW¼ of Section 6, and that the market value of such leasehold estate at that time was $200 per acre, or a total of $39,720.00. The prayer of the plaintiffs' amended complaint was that the defendant be ejected from the possession of the oil and gas lease of the SW¼ of Section 6, and that the plaintiffs recover the amount of $79,440.00 as damages, together with reasonable attorney's fees and their costs.

Also, on the same date the plaintiffs filed an answer to the intervention of Gulf and a counterclaim against Gulf, in which they prayed judgment against Gulf for $39,720.00, and filed their motion to transfer the case to the Circuit Court of the Southern District of Logan County. The motion was not acted upon by the Chancery Court.

On September 26, 1967, the defendant Union and the intervenor Gulf filed their joint petition for removal on the grounds of diversity of citizenship and the amount involved.

On October 3, 1967, defendant Union filed its answer to the amended complaint, in which it denied that the oil and gas lease had expired as alleged in plaintiffs' amended complaint, and alleged that Gulf commenced drilling operations of a well prior to August 1, 1967, pursuant to agreement by and between the defendant and the plaintiffs' attorney of record, Karl D. Glass.

The defendant further alleged:

" * * * specifically that plaintiffs are estopped to claim the forfeiture or termination or abandonment of any of said leased premises, by virtue of the aforesaid settlement agreement, and further waived any right to declare forfeiture or termination or right to cancellation by virtue of said agreement. Defendant further specifically pleads waiver and laches as a defense to any action on the part of plaintiffs to secure cancellation in whole or in part of any of the leasehold premises covered by the aforesaid lease, and further specifically plead waiver, estoppel and laches to any claim or cause of action of plaintiffs set forth in said complaint or amended complaint."

On October 4, 1967, Gulf filed its answer to the counterclaim of plaintiffs.

### Findings of Fact, Discussion, and Conclusions of Law

As heretofore shown by the abstract of the pleadings, this case was commenced October 29, 1966, by filing a complaint in equity, in which plaintiffs sought to cancel the lease on the SW¼ of Section 6 on the ground that "more than a reasonable time has elapsed without operations having been commenced and plaintiffs alleged they are entitled to have the lease cancelled * * *." On September 15, 1967, plaintiffs filed an

amended complaint in which they alleged that the lease in Section 6 expired by its own terms on March 6, 1967, and that in August 1967 the intervenor, Gulf, commenced the drilling of a well in Section 6. The prayer of the amended complaint is for damages by reason of the entry of Gulf on the land in Section 6.

As shown by the lease heretofore set forth, lands in Sections 6, 7 and 12 were included. The land in Section 7 was unitized so as to form a drilling unit. The Peacock well was drilled on the unit but not on plaintiffs' land in Section 7. In due time the well was completed, but production from it was delayed approximately one year awaiting the construction of a pipeline. The first royalty check received by plaintiffs was dated February 12, 1962, covering the period from February 1, 1961, to December 1, 1961, in the sum of $1,265.97. Royalty checks were received from that date until September 20, 1967, when the well had practically ceased production.

On February 23, 1968, the defendant, Union, filed in court for the benefit of plaintiffs a check dated February 15, 1968, for $27.28 covering the royalties due plaintiffs for the months of August through December 1967. At the same time the defendant filed a surrender of the oil and gas lease involved herein. The court entered an order that the check and the formal surrender of the lease be delivered upon written request of plaintiffs' attorneys of record accompanied by receipt signed by plaintiffs in person. The Peacock Unit well was plugged in January 1968.

The learned attorneys for plaintiffs, in support of their claim, as set forth in the amended complaint, in effect contend that the lease on Section 6 forfeited on March 6, 1967, and that at the time Gulf began drilling on Section 6 under the farm-out agreement with Union the lease had expired and Gulf was wrongfully in possession of the land.

The plaintiffs cite a great many decisions of the Supreme Court of Arkansas in support of their contentions, notably: Mansfield Gas Co. v. Parkhill (1914) 114 Ark. 419, 169 S.W. 957; Ezzell v. Oil Associates, Inc. (1930) 180 Ark. 802, 22 S. W.2d 1015; Standard Oil Co. v. Giller (1931) 183 Ark. 776, 38 S.W.2d 766; Alphin v. Gulf Refining Co. (W.D.Ark. 1941) 39 F.Supp. 570; Skelly Oil Co. v. Scoggins (1959) 231 Ark. 357, 329 S.W. 2d 424; Nolan v. Thomas (1958) 228 Ark. 572, 309 S.W.2d 727.

■ An examination of the decisions cited discloses that they are all suits to cancel a lease because of the alleged failure of the lessee to develop the lease. Without doubt, under the law of Arkansas the implied covenants in every oil and gas lease require that the lessee be diligent in the development of the lease, and if the lessee is not diligent, then the lessor has a right to have the lease cancelled.

In Giller, supra, the court at page 778 of 183 Ark. at page 766 of 38 S.W.2d said:

"In the case of Ezzell v. Oil Associates, supra, this court formulated a rule as a guide for the lessee in the performance of his implied covenant to explore, develop, and produce oil and gas upon the leased premises, and in doing so used the following language:

" 'Of course, due deference should be given to the judgment of the lessee as operator to determine how many wells should be drilled, but he must use sound judgment in the matter and cannot act arbitrarily. He must deal with the leased premises so as to promote the interest of both parties and to protect their mutual interests. He must act for the mutual advantage and proceed for both of them, and must not consider his own interest wholly or for the most part. He must perform the contract so as to further the original purpose and intention of the parties.' "

■ The plaintiffs, introduced no evidence that the defendant had not exercised sound judgment in delaying the development of the land in Section 6 and had acted arbitrarily. The evidence introduced by defendant established beyond doubt that it and other oil operators en-

deavoring to develop the Booneville gas field went far beyond what the law required of them. A survey of the number of wells drilled in the vicinity of the land in Section 6 discloses the loss of a great deal of money by the defendant, as well as the intervenor and others, in attempting to develop the area as a gas field. The Skelly-Moore well in Section 5 was completed in July 1966. In August 1966 Gulf gave consideration to the development of its 80-acre lease in the adjoining Section 6. The other land in Section 6 was subject to leases held by the defendant. This consideration was prompted by geological information obtained from the drilling of the Skelly-Moore well which indicated that gas-bearing sands producing in Section 5 would continue to be productive in Section 6. On August 10, 1966, Gulf wrote Union proposing that the two companies participate in the drilling of a well in Section 6, with each company sharing the cost on a pro-rata basis upon the number of acres each held in the section. On October 27, 1966, defendant advised Gulf that it had a well scheduled for Section 6 for the year 1967, but the plaintiffs filed their original complaint in the Chancery Court to cancel the lease held by Union on Section 6. This naturally caused delay, but upon a further consideration of newly developed geological information, the defendant and intervenor decided, in view of the Goss No. 1 Looney well in Section 4, that there was a possibility that the gas extended into Section 6.

The evidence concerning the activity not only of the defendant and the intervenor but other companies in the area is convincing that both the defendant and the intervenor acted in the utmost good faith and made every effort to develop leases held by them, which, of course, included the lease of plaintiffs of Section 6, and it does not seem necessary to comment further on the question of diligence on the part of defendant and intervenor.

The land of plaintiffs located in Section 6 was not incorporated in the Peacock drilling unit, but at the time Gulf began the drilling on Section 6 the lease was valid and unimpaired.

■ Under the law of Arkansas, and in the majority of jurisdictions where the issue has been determined, where only a portion of the leased land is unitized or pooled with land not covered by the lease and drilling is commenced within the unit, although not on the land covered by the lease, this is sufficient to keep alive and extend the *entire* lease including lands outside of the area unitized.

In 5 Summers, Oil and Gas, (Perm. Ed.) § 959, p. 80, the learned author states:

"The habendum clause of the typical oil and gas lease is indivisible as to lease perpetuation if production in paying quantities is obtained anywhere in acreage subject to the lease in all states but Louisiana so that, if a portion of a lease is assigned and production obtained in that portion it will perpetuate the entire lease. Even * * * the Louisiana cases certainly have not treated the inclusion of but a portion of a lease in a pooled unit as a segregation of the leasehold into separate portions with acreage outside the pooled unit disabled from enjoying habendum clause perpetuation through production anywhere in the pooled unit, whether on or off the lease.

"With the exception of but one jurisdiction, and there limited to compulsory pooled units, this indivisibility principle has been applied in both compulsory and voluntary pooled unit situations. * * *

"Additionally, the great weight of authority extends this principle in both compulsory and voluntary pooling and unitizations to lease acreage outside the pooled unit regardless of well location * * *.

"The remedy of the lessor where outside acreage is so held is said to be enforcement of the implied covenant to develop, as in any lease situation where the lease has been perpetuated by production * * *."

One of the cases cited by the author is Gray v. Cameron (1950) 218 Ark. 142, 234 S.W.2d 769. The syllabus, an accurate statement of the holding, reads as follows:

"Contracts—Oil and Gas Leases.— Lands leased in 1944 as to which royalties were outstanding when the litigation resulting in this appeal was instituted, were partially included in a unitized 80-acre drilling tract. The original lease contemplated merger with other tracts if that course should be found necessary. At the time the lease was sold the Oil and Gas Commission had limited drilling in that field to one well to 80 acres. A unitization contract was executed April 29, 1946, but included only 8.81 acres of the 35-acre tract first leased. Held, that language of the unitization contract was sufficient to hold the lease on the outside 26.81 acres, and the Chancellor correctly refused cancellation."

Other cases, some of which are cited by plaintiffs, are discussed in Gray v. Cameron.

The pooling clause of the lease executed by plaintiffs provides:

"The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not."

Gray v. Cameron, supra, was followed by the United States Court of Appeals in Scott v. Pure Oil Co. (5 Cir. 1952) 194 F.2d 393, where the court at page 395 said:

" * * * The Supreme Court of Louisiana, and the Supreme Court of Arkansas, have adjudged under somewhat similar provisions, as we do, that where a portion of the whole leased acreage is rightfully unitized production in paying quantities during the primary term of a gas and oil lease, although not from a well on such leased property, maintains the lease in effect as to that part of the leased land which is not included in the unit. The cases of Gray v. Cameron [218 Ark. 142, 234 S.W.2d 769]; Hunter Co. v. Shell Oil Co. [211 La. 893, 31 So.2d 10] and LeBlanc v. Danciger Oil & Refining Co. [218 La. 463, 49 So.2d 855], supra, differ in facts from the instant case in that the unitization took place in accordance with orders of the local conservation commission. However, each of these cases, as well as Jackson v. Hunt Oil Co., [208 La. 156, 23 So.2d 31] supra, give effect to the proposition that where the authority for the unitization so provides, the production in paying quantities from the well or wells on the area unitized may be imputed as the required production from each of such component tracts so as to continue such individual leases in force as to their entire acreage—that both within and without the united area."

In Clovis v. Pacific Northwest Pipeline Corporation (1959) Colo., 345 P.2d 729, the court beginning at page 730 of 345 P.2d said:

"Two questions of law were decided by the trial court:

1. Does the drilling of a productive well within a pooled unit upon part of plaintiffs' lands covered by the lease validate the lease as to that part of the plaintiffs' leased lands lying outside of said unit?

2. Does the drilling of a productive well within a pooled unit containing a portion of the plaintiffs' leased lands but not upon plaintiffs' lands within the unit validate the lease as to those parts of the plaintiffs' leased lands lying outside of the said unit?

"These two questions were both answered affirmatively and correctly by the trial court when it applied what is termed the majority rule to this fact situation.

"We find two lines of authority on the applicable law. The one which seems the most reasonable and just to us is the majority rule followed in several jurisdictions. It holds that in both types of situations the drilling of a producing well within a unit validates the outside acreage contained within the same lease. See Hunter Co. v. Shell Oil Co., 1947, 211 La. 893, 31 So.2d 10; LeBlanc v. Danciger Oil & Refining Co., 1950, 218 La. 463, 49 So. 2d 855; Gray v. Cameron, 1951, 218 Ark. 142, 234 S.W.2d 769 (lease contained unitization authority); Trawick v. Castleberry, Okl.1954, 275 P.2d 292; Buchanan v. Sinclair Oil & Gas Co., 5 Cir., 1955, 218 F.2d 436 (lease contained unitization authority); and in relation to non-contiguous tracts the same rule was applied in McCammon v. Texas Co., D.C.D.Kan.1955, 137 F. Supp. 256. Also see Hillegust v. Amerada Petroleum Corp., Tex.Civ.App. 1955, 282 S.W.2d 892, where two non-contiguous tracts were under a single lease and it was held that production on one extended the lease beyond the primary term as to the other.

\* \* \* \* \* \*

"Plaintiffs contend that by the adoption of this rule defendants can from now on retain the non-unitized lands doing nothing with them in the future to plaintiffs' detriment. This of course is not so. The rationale of the majority rule is recognition by the courts that the implied covenants for reasonable development and protection against drainage apply to leased lands outside of pooled units such as those held by defendants. These covenants are deemed by the courts to be sufficient remedies to compel lessees to protect the lessors' other lands from drainage and to proceed with their reasonable development in due course. We add that these covenants exist independent of the primary term and continue to protect the outside acreage. The covenant to develop requires the lessee to develop all of the lease as would any ordinary prudent operator.

These plaintiffs have a remedy for a breach of this covenant if it occurs, which remedy could consist of either a cancellation of that part of the lease, for damages, or for both. (Citing authorities.)

"The minority rule urged by plaintiffs, and which we decline to follow, in our view fails to consider the applicability of the implied covenant of reasonable development to the type of situation before us."

■ The well on the Peacock Unit was actually producing gas and plaintiffs were receiving royalty checks at the time Gulf began the well on Section 6 and during all the time the well was being drilled. Thus, the lease on Section 6 was not subject to cancellation except upon a showing of the failure of the defendant to use proper diligence and judgment in the development of the lease on Section 6.

The lease provides:

*"Should production from the above described land, or the acreage pooled therewith, cease from any cause after the expiration of the primary term this lease shall not terminate provided lessee succeeds in bringing back such production within six (6) months from such cessation, or within such six (6) month period commences drilling another well on the above described land or on land polled therewith, and prosecutes the drilling thereof with due diligence to completion, and if such production is restored through any such operations this lease shall continue with the like effect as if there had been no cessation thereof."* (Emphasis added.)

Thus, aside from the other contentions of plaintiffs, the lease on Section 6 was valid and in force prior to and at all of the time the intervenor was drilling on the lease.

This brings the court to a consideration of the action of the parties as established by the evidence leading up to the actual drilling of the well on Section 6 by Gulf.

On January 26, 1967, one of Union's attorneys wrote a letter to the attorney of record for plaintiffs, Mr. Glass, in which he stated that it might be possible for Union to secure commencement of a well in Section 6 by a farm-out to Gulf, but that such an agreement would require that the action (first action Oct. 29, 1966) be dismissed. On February 8, 1967, the plaintiffs' attorney, Mr. Glass, answered defendant's letter and advised him that the suit would be dismissed on the payment of $25 per acre by defendant. From March through May 15, 1967, discussions continued between Union's attorneys and Mr. Glass. On the latter date, Mr. Glass met with one of the attorneys for Union and they discussed the action that was then pending. Glass offered, as a compromise settlement, to dismiss the suit in the event a well was commenced on Section 6 within thirty days. The attorney for Union advised that he thought it would require 60 to 90 days before the farm-out arrangement could be completed and all arrangements made. At the trial of the cause, Mr. Glass testified that he was authorized by plaintiffs to settle the pending action if a well could be commenced within thirty days. However, Mr. Brixey denied that any such authority was granted to Glass. On May 29, 1967, one of defendant's attorneys wrote Mr. Glass and advised that "neither Gulf nor Union are able to make a definite commitment at this time because of the pendency of the above case," and suggested a period of 90 days for defendant to either commence a well, farm-out to Gulf, or release the lease. This letter was not answered by Mr. Glass. Prior to June 21 the attorney for Union had undertaken to reach Mr. Glass by telephone, but was unable to do so, and sent a telegram and a letter to Mr. Glass advising him as follows:

"We have been unable to reach you by telephone for the last two days and have sent you a telegram advising that Union is to farm-out to Gulf Oil Corporation, with well commencement date of August 1, 1967, on condition that the above style case is dismissed. Both Gulf and Union Oil request an immediate answer and we therefore request that you contact us just as soon as possible."

A settlement agreement was reached between the plaintiffs and the defendant on June 22, 1967, and on the same day a telegram was sent to the attorneys for defendant by Mr. Glass, which reads as follows:

"Regarding Brixey v. Pure Oil Co. Farm out arrangement with Gulf Oil Corp. with well commencement date Aug. 1, 1967. Agreeable with my client, Frank Brixey. Will prepare dismissal order without prejudice immediately. Will personally deliver dismissal order to your office on June 23, 1967."

The action was dismissed on June 30, 1967.

Some delay was encountered in obtaining the entry of the order of dismissal arising because the Chancellor, Honorable Paul X. Williams, was appointed and qualified as U. S. District Judge for the Western District of Arkansas on June 23, 1967, but Judge Mobley was finally designated to sit as Special Chancellor, and on June 30, 1967, the case was dismissed without prejudice.

The plaintiffs introduced as their Exhibit 8 a copy of a letter, dated June 29, 1967, from Mr. Glass to Mr. Vater, one of the attorneys for defendant, which stated:

" * * * My last conversation with you indicated that drilling operations would commence by August 1, 1967, providing the suit would be dismissed without prejudice.

"I have this day discussed this matter with Mr. Brixey, who now feels that a sufficient amount of time has passed within which to start drilling operations or release the leases which are outstanding on this property. Mr. Brixey indicates that it is his position that he will dismiss his suit if your clients will pay the sum of $10.00 per acre and guarantee the commencement of a well within six (6) months. If

no well is commenced within six (6) months, then the leases on this property shall be released to him.

"It is further the Plaintiff's proposal that if production is obtained from this proposed well that he be guaranteed the sum of at least $10.00 per acre per year income from said property with the stipulation that if such is not forthcoming, then the lease will be released.

"Although I had indicated to you in our last conversation that the proposed well commencement date of August 1, 1967, would be agreeable, it is now the position of my client, Mr. Brixey, that the above terms must be met prior to a dismissal of this suit."

The letter was addressed to Mr. Robert Vater, Attorney at Law, 14 No. 6 Street, Fort Smith, Arkansas. That is not now and was not at that time the correct address of Mr. Vater. Mr. Vater did not receive the letter, and under the circumstances the court is of the opinion that the letter was not mailed. The letter was alleged to have been written on June 29, and the statements therein are contrary to what the plaintiffs and Mr. Glass actually did on the next day, June 30, by appearing before Judge Mobley, Acting Chancellor, and dismissing the complaint that had been filed October 29, 1966.

Gulf commenced preliminary work on July 7, 1967, and actual drilling began on July 17, 1967. There is no dispute over whether the required action for acceptance was timely commenced.

The plaintiffs now contend that contrary to the statement in the telegram that it was "agreeable to my client," that no authority was ever given to Glass and that they had no knowledge of any negotiations respecting a settlement based on Gulf's willingness to drill. Considering the testimony of Mr. Glass, the attorney of record on the original complaint and also on the amended complaint, filed September 15, 1967, along with the testimony of Olin Waggoner, the court is con-

vinced that Mr. Brixey knew of the negotiations. In fact, he advised Mr. Waggoner that a well would be commenced in August. At the hearing on July 31, 1967, when the order of dismissal was set aside and the claim of plaintiffs reinstated, heated words were exchanged between Mr. Brixey and Mr. Glass, Mr. Glass told Mr. Brixey that he had done only what he had wanted him to do.

In Beth v. Harris, Executor (1945) 208 Ark. 903, 188 S.W.2d 119, the court at page 907 of 208 Ark. said:

"There is no suggestion that any advantage of Jones was taken by opposing counsel. The contrary is conclusively shown. The depositions which he had taken were found in his files, but the exhibits had never been attached. This may account for the failure of Jones to file the depositions, and if so, the negligence and inattention of the clients themselves was responsible for the failure to file the depositions. However, the clients are bound by the inaction and inattention of their attorney. At Sec. 78, Ch. Attorneys, 5 Am.Jur. 306, it is said: 'The courts will not usually relieve a party against the fault or negligence of his attorney, unless it is an extreme case where a clear failure of justice would otherwise result, particularly if the client is also negligent where, by diligence, he might have avoided the consequences of his attorney's negligence.'

"Here we are asked to vacate a judgment after the expiration of the term at which it was rendered, and to do so because of unavoidable casualty. In the case of Lawson v. Bettison, 12 Ark. 401, it was held that when a person employs an attorney, he is concluded by his acts or omissions, where no fraud or unfairness is made to appear."

In St. Louis-San Francisco Railway Co., Thompson, Trustee, v. Lee Wilson & Co. (1947) 212 Ark. 474, 206 S.W.2d 175, the court, in speaking of the relationship between a principal and his

agent, said at page 481 of 212 Ark., at page 178 of 206 S.W.2d:

"Was Regenold the 'regularly appointed freight agent' of the defendant within the meaning of this provision of the shipping contract? When the evidence is given its highest probative value in support of the trial court's finding on this issue we hold that he was, and that the above provision of the shipping contract is inapplicable here. It is true that Regenold was not a salaried employee of the defendant and that there was no regular freight depot maintained by defendant at Armorel. However, the defendant authorized and permitted Regenold to perform the duties of a freight agent in signing bills of lading for the shipment of commodities by the plaintiff. He was defendant's regularly constituted and appointed agent for this purpose, and the arrangement was for the mutual benefit of the parties. The testimony shows that defendant ratified the unauthorized acts of Regenold in signing bills of lading for shipment of alfalfa meal. It is well settled that when a principal has knowledge of the unauthorized acts of his agent and remains silent when he should speak, or accepts the benefits of such acts, he cannot thereafter be heard to deny the agency, but will be held to have ratified said agent's unauthorized acts. Coffin v. Planters' Cotton Company, 124 Ark. 360, 187 S.W. 309, and cases there cited: Kirkpatrick Finance Co. v. Stotts, 183 Ark. 1089, 51 S.W.2d 512; Restatement of the Law of Agency, Vol. 1, Sec. 94."

■ The court is of the opinion and finds from the evidence that the settlement made by Glass with the attorney for the defendant was made within the authority conferred upon Glass by plaintiffs, and that plaintiffs are bound by such agreement. There can be no question that the plaintiffs were fully advised of everything that Glass did, and that his actions were ratified by plaintiffs.

■ This brings the court to a consideration of the plea of estoppel asserted by the defendant and Gulf. The court is of the opinion that the plaintiffs are estopped by their conduct from claiming damages for the destruction of an alleged speculative value of the minerals and the leasehold by the drilling of a dry hole.

Gulf began clearing the drill site on or about July 10, 1967, and began actual drilling on July 17, well within the thirty days after the controversy was settled.

■ Equitable estoppel requires, as to persons against whom the estoppel is claimed, opportunity to speak, duty to speak, failure to speak, and reliance in good faith upon such failure. Ferguson v. Guydon (1921) 148 Ark. 295, 230 S.W. 260.

In American Casualty Co. of Reading, Pennsylvania v. Hambleton (1961) 233 Ark. 942, 349 S.W.2d 664, the court at page 946 of 233 Ark. at page 667 of 349 S.W.2d said:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights of property, contract or remedy, which might otherwise have existed, as against another person who has in good faith relied thereon and been led to change his position for the worse. Geren v. Caldarera, 1911, 99 Ark. 260, 138 S.W. 335.

"A party who, by his acts, declarations or admissions, or by failure to act or speak under circumstances where he should do so, either designed or with willful disregard of interest of others, induces or misleads another to conduct or dealings which he would not have entered upon but for such misleading influence, will not be allowed, because of estoppel, afterwards to assert his right to the detriment of person so misled. Dobbins v. Martin Buick Co., 216 Ark. 861, 227 S.W.2d 620; Williams v. Davis, 211 Ark. 725, 202 S.W. 2d 205; Rogers v. Hill, 217 Ark. 619, 232 S.W.2d 443."

Involved in Hodges v. Harrell (1927) 173 Ark. 210, 293 S.W. 25, was a question

of the waiver of forfeiture of lease, and the court held: "A provision in an oil lease for forfeiture for failure of lessee or assignee to drill a well within 5 years was waived where the lessor allowed the assignee to enter upon the lease and begin drilling a lease after the five-year period without taking any steps to prevent drilling."

In Vickers v. Peaker (1957) 227 Ark. 587, 300 S.W.2d 29, the court held:

"Oil and gas assignment requiring, under penalty of forfeiture, that the assignee commence the drilling of a well on or before September 15, 1955, held not forfeited, under the circumstances, by the mere failure of the drill bit to pierce the earth before that date. * * *

"Assignor of oil and gas lease who stood by and permitted the assignee to drill, held estopped by his silence from claiming a forfeiture of the assignment even though the assignee failed to commence and complete a well to the required depth within the time limits of the assignment."

In the opinion the court at page 595 of 227 Ark. at page 34 of 300 S.W.2d said:

"In Keylon v. Arnold, 213 Ark. 130, 209 S.W. 459, 461 we discussed equitable estoppel by silence and quoted from 19 Am.Jur. 661:

" 'An estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. Estoppel by silence or inaction is often referred to as estoppel by "standing by", and that phrase in this connection has almost lost its primary significance of actual presence or participation in the transaction and generally covers any silence where there are a knowledge and a duty to make a disclosure. The principle underlying such estoppels is embodied in the maxim "one who is silent when he ought to speak will not be heard to speak when he ought to be silent.' "

"In Johnson v. Spencer, 222 Ark. 710, 262 S.W.2d 290, we also discussed equitable estoppel by silence. The cited cases conclusively show that all the equities in the case at bar are against the appellants."

The court is of the opinion that under the facts as found by the court the plaintiffs are estopped from claiming damages against either Union or Gulf.

For the reasons hereinbefore stated, the original complaint and the amended complaint should be dismissed, and judgment is being entered today dismissing the original complaint and the amended complaint of plaintiffs and adjudging costs in favor of the defendant, Union, and the intervenor, Gulf.