Albert Jean PERRY, et al. *v.* NICOR EXPLORATION, et al.

87-27 738 S.W.2d 414

Supreme Court of Arkansas
Opinion delivered November 2, 1987
[Rehearing denied December 7, 1987.]

418

*Gardner, Gardner & Hardin*, by: *Stephen C. Gardner*, for appellant.

*Hardin, Jesson & Dawson*, by: *P.H. Hardin* and *Betsy Hall*, for appellee.

ROBERT H. DUDLEY, Justice. Appellants, plaintiffs below, appeal from the chancellor's refusal to cancel twenty-two (22) oil and gas leases in which appellees, defendants below, own the working interest and overriding royalty interest. We affirm.

On August 23, 1969, the McCarty A-#1 gas well was completed. The well, subsequently renamed the McCarty B-#1 gas well, is located in a 640 acre drilling unit in the Alma Field in Crawford County. Beginning in 1983, appellant Thomas Mueller obtained top leases on twenty-two leases covering approximately 200 acres of the 640 acre drilling unit. The remaining appellants are landowners who either executed the original twenty-two (22) oil and gas leases in question, or purchased their land subject to them. Notice and demand letters were mailed to appellees on June 20, 1985. On October 21, 1985, appellants filed their suit asking that the original leases be cancelled for lack of paying production from the well. Appellees counterclaimed that the

Mueller top leases constituted a wrongful interference which created clouds upon their leases. After hearing all of the evidence, the chancellor found that the well was producing in paying quantities.

Appellants first contend that the chancellor erred in considering the unit as a whole in determining whether the well was producing in paying quantities. It is undisputed that each of the twenty-two leases were in their secondary term. Consequently, in accordance with the leases' habendum clauses, the well had to be producing in paying quantities to the lessee or the leases could be cancelled. *Turner* v. *Reynolds Metals Co.*, 290 Ark. 481, 721 S.W.2d 626 (1986).

Appellants argue that in making the determination of whether the well was producing in paying quantities, profitability with respect to each individual lease should be considered. There are five gas purchase contracts covering the gas from the McCarty B-#1 well. One of the contracts, the oldest, pays only 17 cents per thousand cubic feet. The other gas purchase contracts provide for a substantially higher price. Appellants argue that the contract paying 17 cents is the only one which pertains to the twenty-two leases in question, and that the low price makes production of gas unprofitable with respect to those leases. The argument is without merit.

One witness, Joyce Hodge, a TXO landman for nine years, explained that the testimony presented by appellants concerning payment under the gas contracts was not accurate. She testified that appellants' leases were subject not only to the 17 cents contract, but also to the other higher-priced contracts. She additionally explained that no one in the chain of title or chain of purchase makes any distinction as to a particular lessor; there was no way to tell where the gas is drawn from and it cannot be attributed to any particular lessor.

In *Hurley Enterprises, Inc.* v. *Sun Gas Co.*, 543 F. Supp. 359 (W.D. Ark.), *aff'd*, 696 F.2d 1001 (8th Cir. 1982), the lessor sought partial cancellation of an oil and gas lease. The lease covered 2,195 acres. The lessor sought to cancel it with respect to 339 acres, contending that the lease automatically terminated with respect to those acres when the unit was shut-in for more than sixty days before a shut-in royalty was received. The lessees

in the suit contended that the portion of the lease covering the 339 acres was held by production from other wells included in the lease. The trial court found in favor of the lessees. In doing so, it followed the majority rule which provides that the habendum clause is indivisible, and that all lands embraced in the lease will be held by production in paying quantities from lands located anywhere within the acreage subject to the lease. Appellees argue, and we agree, that *Hurley* analogously supports their position because just as the lease is indivisible as to its parts, so are the leases indivisible as to the unit by virtue of the concept of unitization.

Another case which provides strong analogous support for appellees' position is *Brixey* v. *Union Oil Co.*, 283 F. Supp. 353 (W.D. Ark. 1968). In *Brixey*, a portion of the land covered by a lease was pooled into a unit. The lessees sought to cancel the portion of the lease covering land outside the unit. The court denied the requested relief explaining:

> Under the law of Arkansas, and in the majority of jurisdictions where the issue has been determined, where only a portion of the leased land is unitized or pooled with land not covered by the lease and drilling is commenced within the unit, although not on the land covered by the lease, this is sufficient to keep alive and extend the *entire* lease including lands outside of the area unitized.

*Brixey*, 283 F. Supp. at 359; *See also Gray* v. *Cameron*, 218 Ark. 142, 234 S.W.2d 769 (1950).

Aside from the logical appeal of appellees' argument and the analogous support of cases such as *Hurley* and *Brixey*, there is also considerable support for appellees' position in the leases themselves. The twenty-two leases in question were introduced at trial. Each of them contains what is commonly referred to as a pooling clause. The pooling clauses all provide that the lessors, appellants, agree that the covered acreage may be pooled to form a unit at the lessees' option. They further provide that operations on any part of any lands so pooled shall, except for payment of royalties, be considered operations on leased premises under the lease. The import of the pooling clause is clear: The focus must be on whether the *well* is producing gas in paying quantities to the lessee, and that can only be determined by

examining production from the unit as a whole.

Appellants next contend that even if production is considered from the unit as a whole, the chancellor erred in finding that the well was producing in paying quantities. Again, the argument is without merit.

 Numerous exhibits and computations were presented by each side concerning the profitability of the well. Each side contested the evidence presented by the other. In reviewing chancery cases on appeal, this Court must afford due deference to the chancellor's superior position to determine the credibility of the witnesses and the weight to be given their testimony. *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984). Further, although this Court tries chancery cases de novo on appeal, we will not reverse the findings of a chancellor unless they are clearly erroneous. *Id.*

In their case in chief, appellants presented lengthy, detailed exhibits and testimony which prorated revenue and expenses based upon their theory that consideration of the case should be limited to the twenty-two leases and should not involve the unit as a whole. In preparing those exhibits appellants only considered the gas purchase contract carrying a price of 17 cents per thousand cubic feet. They did not take into account the other four gas purchase contracts which set the price considerably higher. Since there was proof that appellants' leases were subject to all of the gas purchase contracts, the trial court may well have found that the appellants' exhibits were fatally flawed from the beginning.

 Appellees then presented testimony and exhibits showing that overall revenue from the well exceeded the direct cost of lifting during the period 1982 through 1985. On rebuttal, appellants attempted to modify some of their original calculations to take into account the entire unit. A witness for appellants, Jim Slade, prepared the adjusted calculations and testified that in his opinion the well lost money in 1982, 1983, and 1984. Cross-examination, however, revealed that he did not know if some of the expenses used in his calculations were directly related to lifting. In short, appellants had the burden of proving that the well was not producing in paying quantities. The chancellor examined the numerous exhibits presented by the parties and

heard the testimony concerning them. She determined that the gas well was producing in paying quantities. We have reviewed all of the evidence, and the chancellor's finding in that regard is not clearly erroneous.

Affirmed.