HURLEY ENTERPRISES, INC., An Arkansas Corporation, Plaintiff,

v.

SUN GAS COMPANY, A DIVISION OF SUN OIL COMPANY (DELAWARE), a Delaware Corporation, and Gulf Oil Corporation, A Pennsylvania Corporation, Defendants.

Civ. No. 81–2040.

United States District Court, W. D. Arkansas, Fort Smith Division.

July 13, 1982.

Charles Karr, Martin, Vater & Karr, Fort Smith, Ark., for plaintiff.

Bradley D. Jesson, Hardin, Jesson & Dawson, Fort Smith, Ark., for defendant Sun Gas Co.

Thomas A. Daily, Daily, West, Core & Coffman, Fort Smith, Ark., for defendant Gulf Oil Corp.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action seeking partial cancellation of an oil and gas lease covering some 2,195.35 acres in Johnson County, Arkansas, entered into in 1956 between Excelsior Coal Company, Lessor, and Gulf Refining Company, Lessee. The lands covered by the lease are contained in Sections 16, 17, 18, 19, 20, 21 and 28 in Township 9 North, Range 23 West. The land is situated between the City of Clarksville, Arkansas, and the Arkansas River. According to the complaint, the lands were acquired from Excelsior by Ozark Real Estate Company in 1959, and the name of the company was subsequently changed to Hurley Enterprises, Inc., the plaintiff in this matter.

It is alleged that on or about August 23, 1967, Gulf assigned to Sunray DX Oil Company its rights in the lease as they pertained to Section 18, Township 9 North, Range 23 West (the portion of the property which is the subject matter of this lawsuit), and Gulf reserved and retained an overriding royalty of one-eighth (⅛) of seven-eighths (⅞) of all oil and gas produced from the assigned premises. In addition, Gulf reserved and retained the rights to all oil and gas found in such premises below the base of the Cecil Spiro Sands.

Plaintiff seeks to cancel the portion of the lease applying to the Fractional South One-half (S ½) of the subject section, containing 339.23 acres, for the alleged reason that defendants had failed and refused to use reasonable diligence in the exploration and development of the land under lease, and for the further reason that defendants shut-in a producing gas well on June 21, 1979, and did not make timely shut-in payments as required by paragraph 6 of the lease. Plaintiff alleges that because of the failure to make such timely payments, the lease automatically terminated as to the lands in question.

It is also alleged that defendants have failed and refused to use reasonable diligence in marketing the gas capable of being produced from the lands in question and, therefore, breached their implied covenant to do so. In addition, it is claimed that offset wells are draining the minerals under the lands in question and that defendants have failed and refused to use reasonable diligence in protecting plaintiff from such drainage, thereby breaching an implied covenant to protect plaintiff's lands from such drainage.

Suit was filed in the Circuit Court of Johnson County, Arkansas, and was removed to this court by reason of diversity of citizenship and sufficient jurisdictional amount having been alleged. The matter was tried to the Court without a jury on May 10, 1982, and the attorneys for the parties were granted 30 days in which to

submit briefs. Excellent briefs have been received from all parties, and the Court is now prepared to rule, making its findings of fact and conclusions of law, separately stated.

### Discussion

Although there are certain facts in dispute, the facts necessary for a decision are not greatly in dispute. It is agreed, as alleged in the complaint, that the plaintiff's predecessor in title, Excelsior Coal Company, entered into the subject lease agreement in July, 1956, covering the 2,195.35 acres in Johnson County, Arkansas, more particularly described above. At the time the lease was entered into, there was little, if any, production in the area of the lands covered by the lease, and, undoubtedly for this reason, the lease is not nearly as good a lease, from lessor's standpoint, as could now be entered into, since natural gas, in paying quantities, has been discovered on the subject lands and surrounding lands. The lease calls for lessor to receive a royalty equal to ⅛ of all gas or oil sold from the leased premises. In 1959, Ozark Real Estate Company (now Hurley Enterprises, Inc.) acquired the lands in question from Excelsior.

In the years since 1959 a substantial amount of development has taken place in the area and large quantities of gas are now produced from the area in which the leased lands are located. The evidence at the trial shows that at least one well had been drilled in every section covered by the lease since 1959, and that there has been continuous production in paying quantities since 1964 from a well located in Section 17 of the leased premises and since 1969 from a unit located on Section 19.

The evidence shows that on August 23, 1967, Gulf "farmed out" to Sun Gas Company the S ½ of Section 18 of the leased premises and that Sun in turn pooled that acreage with other leases owned by it covering the N ½ of Section 18 and formed a drilling unit called the "Kettlehut-Shane Unit." Drilling was commenced on the unit in November, 1967, and completed in January, 1968. The well remained in production, in paying quantities, until June 21, 1979, when it was "shut-in" because of mechanical problems with the well. The evidence shows that by June 21, 1979, the well casing or tubing had deteriorated to the point that gas could not be produced from the well in paying quantities. There was no indication from the evidence that the shut-in was because of a lack of gas.

According to the evidence, during the period in which the Kettlehut-Shane # 1 Well was producing, the gas was sold to Arkansas-Louisiana Gas Company, which owned the only pipeline in the area under a purchase contract which had been in existence for some time, calling for the gas to be sold at a price of between 17 cents and 20 cents for 1,000 cubic feet. Because, under current conditions, the purchase price was substantially less than the going market, when the well was shut-in because of mechanical difficulties, Sun contacted Arkla soon thereafter, in August, 1979, in an attempt to renegotiate the purchase contract to increase the amount paid for the gas. Any increase in purchase price would, of course, benefit Hurley as well as Sun. In addition, the increase in price would, of course, help offset the costs of reworking the well. In May, 1980, the purchase contract was successfully renegotiated, and called for an increase in the price of gas produced from the well from the former price of 17 to 20 cents per 1,000 cubic feet to a new price of $1.28 per 1,000 cubic feet, the maximum price authorized under the Natural Gas Policy Act of 1978.

Soon thereafter, Sun entered into a contract with Welltech Corporation calling for the reworking of the well, and reworking commenced in December, 1980, and lasted for over a month. Sun expended a total in excess of $100,000.00 in an attempt to rework the well so that it would again produce, but the attempt was futile. Shortly after attempts to rework the well were abandoned, Sun began a study of the economics of drilling a new well on the premises, and within 60 days after the study was started, a new well was approved. The

study showed that a new well would cost, at that time, $840,000.00, and Sun offered to commence the drilling of a new well. However, the offer was refused by the plaintiff because this lawsuit to cancel the lease had already been instituted. The well has not been drilled because of the pendency of this lawsuit. According to testimony at the trial, a new well would now cost, as of a date one week before the trial, $944,000.00.

Although, as will be discussed in more detail later, the Court is convinced that the lease agreement did not call for the lessee to make a shut-in royalty payment so long as gas is being produced in paying quantities from other lands covered by the lease, Sun mailed to plaintiff in September, 1979, and again in June, 1980, a shut-in royalty check in the amount of $339.32. Both of the checks required a signed receipt by the plaintiff, although royalty checks which had been mailed to plaintiff during the course of dealings between the plaintiff and defendants had not required a signed receipt. The 1981 shut-in royalty check was tendered to the plaintiff and refused by Mr. Sterlin Hurley, who testified at the trial that he was the vice president of the plaintiff.

Mr. Hurley testified that he negotiated the two checks received in 1979 and 1980, but that he did not know what they were for and would not have done so had he known that they were shut-in royalty checks.

In October, 1980, the plaintiff signed a letter, written by Mr. Tom Mueller, demanding that another well be drilled on the S ½ of Section 18 at once. The letter addressed to Sun was mailed to the office in Tulsa, Oklahoma, of its refining and pipeline company and, according to the evidence, was not received by Sun Gas Company or its parent, Sun Oil Company of Delaware. Gulf received an identical letter at that time and referred plaintiff to Sun Gas Company in Dallas. In December, 1980, plaintiff's attorney wrote Sun at the Tulsa address, with a copy to Sun Gas in Dallas, demanding the release of the lease covering the subject property. Sun responded, advising that shut-in royalty payments had been made and that Sun would begin workover activities shortly.

At the trial, Mr. Sterlin Hurley, in the Court's view an astute businessman of 80 years of age, whose obvious intelligence and business acumen displayed at the trial greatly impressed the Court, testified that he had agreed in October of 1980 to lease the S ½ of Section 18 to Tom Mueller, a former member of the Arkansas Oil and Gas Commission, and now a local gas businessman, for a $45.00 per acre bonus plus $\frac{3}{16}$ royalty interest. This compares with the ⅛ royalty interest called for by the 1956 Gulf lease. The agreement was to take effect only if the Gulf lease could be cancelled, and Mr. Hurley testified that Mueller wrote for him the demand letters which were sent to Sun and Gulf in October of 1980. While the evidence on this point is not overwhelming, it appears from Mr. Hurley's testimony that Mueller was the real driving force behind the attempt to cancel the Gulf lease, and that the "deal" was made on the condition that Mueller, at his expense, obtain a cancellation of the Gulf lease. Although it was not clearly admitted by Mr. Hurley, there was some indication during the course of his testimony that Mueller was paying the costs of this litigation.

During his testimony, Mr. Hurley indicated that because of current conditions, he could now obtain "a lot more money" for a new lease, but that he would stick with the deal that he made with Mueller because "I am a man of my word."

From the facts discussed above, which, as indicated, are largely uncontroverted, plaintiff contends that the lease to the S ½ of Section 18 should be cancelled for the reasons that the lease automatically terminated when the Kettlehut-Shane Unit # 1 was shut-in for more than 60 days before a shut-in royalty payment was received and because defendants did not use reasonable diligence in developing such lands after that well ceased production.

On the other hand, the defendants contend that the lease covering the S ½ of

Section 18 is held by production from other wells included in the lease; that there is no showing that it had breached its implied covenant to develop the minerals underlying the lands covered by the lease; and that, in any event, the lease was held in force by the payment of the shut-in royalties and, because of its acceptance of the shut-in royalty payments, plaintiff is estopped from now contending that the lease should be cancelled because of the lateness of the initial payment.

The parties have filed excellent briefs covering the law that is arguably applicable to this case in considerable detail. The Court has concluded that it is not necessary for it to discuss the other issues raised because it finds that the lease to the S ½ of Section 18 is held by production from other wells included in the lease and that the lessees of such lease have not breached an implied covenant to properly develop the minerals located on the lands.

Paragraph 4 of the lease in question provides, in pertinent part, as follows:

> After discovery of any mineral in paying quantities on the land embraced herein or on land pooled therewith, whether during or after the end of the primary term, all of Lessee's rights shall remain in effect so long as such mineral is produced.

The pertinent portions of paragraph 6 of the lease provide:

> Should any well on the land or on a drilling unit formed in a part of a part of said land be completed as a gas or gas-distillate well *at any time while this lease is not being maintained in force by drilling or producing operations on some other well,* and said gas or gas distillate well be shut-in, then until such gas shall be sold or used so as to produce royalty for lessor, or until the discovery of some other mineral in paying quantities on the land, lessee *may pay* to lessor annually as a royalty a sum equal to the annual rental provided for herein, said sum being subject to reduction to the same extent as rentals under the provisions hereof. (emphasis added.)

It was not disputed at the trial that there has been a discovery of minerals in paying quantities in every section of land covered by the Gulf lease with the exception of Section 24 of Township 9 North, Range 24 West, and that lessee or its assignee had drilled a well on that section which did not produce gas in paying quantities. There was evidence submitted at the trial showing that the plaintiff received monthly production royalty payments from production on the leased premises since 1964. Paragraph 4 of the lease (the habendum clause) provides that the lease shall remain in effect so long as there is production "of any mineral in paying quantities on the land embraced herein or land pooled therewith." From the evidence, there can be little question but that there is a production of minerals in paying quantities from lands embraced in the lease and, for this reason, it appears clear to the Court that the lease remains in effect even though the Kettlehut-Shane # 1 well is not now producing and has been shut-in since June of 1979 because of mechanical difficulties in the well.

Although shut-in royalty payments were made, it should be noted that paragraph 6 of the lease does not require such payments so long as the lease is being maintained by producing operations on other premises embraced in the lease.

In the Court's view, when paragraph 4 and paragraph 6 are taken together, the words of the lease appear to be clear and unambiguous and to clearly and unambiguously provide that, so long as there is production from any lands on the lease premises, the lease will remain in effect. It became apparent at the trial, in the Court's view, that Mr. Hurley knew that that was the case and really did not have much hope that the lease could be cancelled. This is undoubtedly the reason that he, in effect, left all of that up to Mr. Mueller, who wants the new lease, at a price that is considerably less than what Mr. Hurley could now obtain for a lease of the premises. Mr. Hurley, who had been the local banker for many years, admitted during cross-examination that he had many people come to him for advice in relation to leasing

their lands to oil and gas companies. He says: "I tell them the best I can and they keep coming back for more. I have people coming in every month." He testified that, when asked for advice by others, he counsels landowners to have separate leases prepared for each section of land which they own because he "understands" that production from an adjoining section will keep the lease alive as to other sections if all sections are encompassed in the same lease.

The "understanding" of Mr. Hurley was well stated by Judge John E. Miller in *Brixey v. Union Oil Company of California*, 283 F.Supp. 353 (W.D.Ark.1968). In that opinion, at p. 359, Judge Miller stated:

Under the law of Arkansas, and in the majority of jurisdictions where the issue has been determined, where only a portion of the leased land is unitized or pooled with land not covered by the lease and drilling is commenced within the unit, although not on the land covered by the lease, this is sufficient to keep alive and extend the entire lease including lands outside of the area unitized.

Judge Miller quoted, with approval, from 5 Summers, Oil and Gas, § 959 (Perm.Ed.):

The habendum clause of the typical oil and gas lease is indivisible as to lease perpetuation if production in paying quantities is obtained anywhere in acreage subject to lease in all states but Louisiana so that, if a portion of a lease is assigned and production obtained in that portion it will perpetuate the entire lease. Even ... the Louisiana cases certainly have not treated the inclusion of but a portion of a lease in a pooled unit as a segregation of the leasehold into separate portions with acreage outside the pooled unit disabled from enjoying habendum clause perpetuation through production anywhere in the pooled unit, whether on or off the lease.

With the exception of but one jurisdiction, and there limited to compulsory pooled units, this indivisibility principle has been applied in both compulsory and voluntary pooled unit situations ....

Additionally, the great weight of authority extends this principle in both compulsory and voluntary pooling and unitizations to lease acreage outside the pooled unit regardless of well location ....

The remedy of the lessor where outside acreage is so held is said to be enforcement of the implied covenant to develop, as in any lease situation where the lease has been perpetuated by production ....

■ Plaintiff apparently contends that since Gulf executed a partial assignment of the lease with respect to Section 18, that section is now subject to a separate lease which cannot be maintained by production in acreage not assigned. If plaintiff does so contend, that contention is unfounded, in the Court's view. Such contention has been made in a number of jurisdictions and has been rejected in all except Louisiana, which is, of course, not a common law state. *See Berry v. Tide Water Associated Oil Co.*, 188 F.2d 820 (5th Cir. (Miss.) 1951); *Sinclair Prairie Oil Co. v. Campbell*, 164 F.2d 907 (5th Cir. (Tex.) 1947); *Cosden Oil Co. v. Scarborough*, 55 F.2d 634 (5th Cir. (Tex.) 1932); *Gulf Oil Corporation v. Prevost*, 358 S.W.2d 876 (Tex.Civ.App.1976); *Dacamara v. Binney*, 146 S.W.2d 440 (Tex.Civ.App. 1940); *Pearson v. Black*, 120 S.W.2d 1075 (Tex.Civ.App.1938); *Smith v. Gypsy Oil*, 130 Okl. 135, 265 P. 647 (1928); *Gypsy Oil Co. v. Cover*, 78 Okl. 158, 189 P. 540 (1920); *State ex rel. Shell Petroleum Corp. v. Worden*, 44 N.M. 400, 103 P.2d 124 (1940); *Wilson v. Texas Co.*, 147 Kan. 449, 76 P.2d 779 (1938); *Cowman v. Phillips Petroleum Co.*, 142 Kan. 762, 51 P.2d 988 (1935); *McCammon v. Texas Co.*, 137 F.Supp. 256 (D.C.Kan.1955); *Cameron v. Lebow*, 366 S.W.2d 164 (Ky. 1962); *Cameron v. Lebow*, 338 S.W.2d 399 (Ky.1960); *Wilson v. Purnell*, 199 Ky. 218, 250 S.W. 850 (1923).

In *Berry v. Tide Water Associated Oil Co., supra*, the Court of Appeals for the Fifth Circuit, in words that this Court believes appropriate in this case, stated:

[W]e should hesitate long before undertaking by construction and interpretation, to distill from one case, so different in its

facts and issues from the one for decision here, a rule of property so fundamental and so far reaching and, in our opinion, *for common law states so unwarranted*, to proclaim it for the State of Mississippi as its binding law. (188 F.2d 820 at 823) (emphasis added.)

In addition to above citations, there are discussions in three of the leading treatises on oil and gas law. *See* Summers Oil & Gas, ch. 10, § 302.1; Kuntz Law of Oil & Gas, § 26.12; and Williams and Meyers Oil & Gas Law, § 406.

The attorneys for all parties agree that the precise question presented has not been answered by the Arkansas Supreme Court. In view of what the Court believes to be the logic of the positions taken in the cases and treatises cited above, the Court concludes that Arkansas, when faced with the question, will adopt what is clearly the majority rule and will disregard the rule that is apparently extant only in Louisiana. Thus, the Court finds that paragraph 4 (the habendum clause) is indivisible, and that all lands embraced in the lease will be held by production in paying quantities of minerals from lands located anywhere within the acreage subject to the lease.

■ However, such a finding does not necessarily settle the issues raised in the case, since, in addition, the plaintiff claims that defendants have breached their implied covenant to develop the minerals on the lands located in the S ½ of Section 18. All parties agree that the law in Arkansas is that a lessee impliedly covenants to explore the lease premises and search for minerals in a proper manner and with reasonable diligence. *See Zappia v. Garner*, 259 Ark. 794, 536 S.W.2d 714 (1976); *Ezzell v. Oil Associates*, 180 Ark. 802, 22 S.W.2d 1015 (1930); *Millar v. Mauney*, 150 Ark. 161, 234 S.W. 498 (1921); and *Nolan v. Thomas*, 228 Ark. 572, 309 S.W.2d 727 (1958).

The Arkansas Supreme Court, in *Amoco Production Co. v. Ware*, 269 Ark. 313, 602 S.W.2d 620, set forth the implied covenants which lessees make in mineral leases as follows:

An implied covenant is one that may be reasonably inferred from the whole agreement and the circumstances attending its execution. They are not favored by the law and can be justified only upon the ground of legal necessity arising from the terms of the contract and the circumstances attending its execution. 20 Am. Jur.2d, Covenants, § 12.

According to a leading authority in the field of oil and gas law, there are essentially five types of implied covenants in oil and gas leases: A covenant to drill wells within a reasonable time, testing the land for oil and gas; a covenant to drill test wells within a reasonable time after notice; a covenant, if oil or gas be found in paying quantities, to proceed with reasonable diligence in drilling sufficient number of wells to reasonably develop the premises; a covenant to protect the land from drainage through wells on adjoining lands, by drilling offset wells; and, a covenant to market the produce of producing wells. Summers, The Law of Oil and Gas, ch. 13, § 395 (Vol. 2, 1959). *See, also*, Judge Miller's discussion of this point in *Brixey, supra*, at p. 358.

The Court does not believe that there is any evidence adduced at the trial from which the Court could logically find that the defendants have breached their implied covenants which they, according to the law of Arkansas, made at the time the lease was entered into. As was already pointed out, a well was drilled on the S ½ of Section 18 and produced for a considerable period of time. Through no fault of defendant Sun, the well ceased to produce gas in paying quantities because of mechanical difficulties which developed in the well. Within a reasonable period of time, in the Court's view, after the well ceased production, the defendant negotiated a new contract with Arkla, increasing the purchase price of the gas to be produced from the well sixfold. Within a reasonable time thereafter, Sun spent over $100,000.00 in an unsuccessful attempt to rework the well, and then, within a reasonable time, offered to spend $840,-000.00 to drill a new well on the premises. The Court believes that this abundantly in-

dicates that Sun has acted in a reasonable and prudent manner in relation to the production of gas from the land in question, and proceeded not only in its best interest but in the best interest of the lessor. The Court believes that the evidence shows that the plaintiff has simply attempted, through the urgings of Mr. Mueller, to obtain a cancellation of the lease because the deal that was made in 1956 is not nearly as good a deal as could now be made because of changing circumstances. However, the Court does not believe that this provides a proper basis for the Court to cancel the lease and to allow the parties to renege on a valid agreement made and still existing.

## FINDINGS OF FACT

From the evidence, the Court makes the following findings of fact:

1. That plaintiff is an Arkansas corporation with its principal place of business located in Arkansas.

2. That defendants, Sun Gas Company and Gulf Oil Corporation, are incorporated in states other than Arkansas, with their principal place of business in states other than Arkansas.

3. That the amount in controversy exceeds $10,000.00, exclusive of interest and costs.

4. That prior to 1959, Excelsior Coal Company was the owner of certain real property consisting of 2,195.35 acres located in Johnson County, Arkansas, contained in Sections 16, 17, 18, 19, 20, 21 and 28, in Township 9 North, Range 23 West, and that such lands are situated between the City of Clarksville, Arkansas, and the Arkansas River.

5. That in July of 1956, Excelsior Coal Company entered into an oil and gas lease with Gulf Refining Company covering the lands described above, and that such lease agreement, among other things, provided for the payment to lessor of a royalty equal to one-eighth (⅛) of the sales price of any oil and gas produced on the lease premises, and, among other provisions, contained the provisions of paragraphs 4 and 6 quoted above.

6. That in 1959 Ozark Real Estate Company, which later changed its name to Hurley Enterprises, Inc., acquired the lands which were subject to such lease agreement.

7. That at the time that the lease agreement was entered into and when the lands were purchased by Hurley in 1959, no production existed from the lease lands or surrounding lands.

8. That in the intervening years since 1959 substantial development has taken place in the Clarksville area, and at least one well has been drilled in every section covered by the lease and that plaintiff has received royalties continuously since 1964 from production on Section 17 of the lease premises, and since 1969 from Section 19.

9. That at the time of the trial, there was at least one producing well on each section of lands encompassed in the lease with the exception of Section 24 of Township 9 North, Range 24 West, on which section a "dry hole" was drilled.

10. That on August 23, 1967, Gulf "farmed out" to Sun Gas Company the South Half (S ½) of Section 18 and Sun pooled that acreage with other leases owned by it covering the North Half (N ½) of Section 18 and formed a drilling unit known as the Kettlehut-Shane Unit. Sun commenced drilling the Kettlehut-Shane # 1 Well in November, 1967, and completed it in 1968, with it remaining in production from that time until June 21, 1979, when it was "shut-in" because of mechanical problems caused by deterioration of the well casing, making it impossible to produce gas in paying quantities from such well.

11. That during the time that the well was in production the gas produced was sold pursuant to a gas purchase contract to Arkansas-Louisiana Gas Company for a price of between 17 cents and 20 cents for 1,000 cubic feet and after the mechanical difficulties caused the well to be "shut-in," in August of 1979 Sun began attempts to renegotiate the gas purchase contract and increased the amount which Arkla would

pay for the gas. That any increase in price would inure to the benefit of both the lessor and the lessee, and in May of 1980 Sun was successful in renegotiating a contract with Arkla, calling for the price of the gas purchased to increase to $1.28 per 1,000 cubic feet, the highest price authorized under the National Gas Policy Act of 1978.

12. That as soon as reasonably possible thereafter, in December of 1980, Sun entered into a contract with Welltech Corporation to rework the Kettlehut-Shane well, with this reworking commencing in December, 1980, and lasting through most of January, 1981. That the cost of the reworking, paid by Sun, amounted to in excess of $100,-000.00, but such reworking proved to be unsuccessful.

13. That within a reasonable time thereafter, Sun began investigating the possibility of drilling a replacement well, and within 60 days of the commencement of such investigation, a time that the Court finds to be reasonable under the circumstances, Sun employees were authorized to commence the drilling of a new well to cost approximately $840,000.00, but because, in the meantime, this litigation had been instituted by plaintiff, plaintiff, in April, 1981, refused to authorize the commencement of the well. That the cost of drilling a new well at a time one week prior to the trial was $944,000.00.

14. That in September of 1979, more than 60 days after the well was shut-in, Sun mailed to plaintiff a shut-in royalty check in the amount of $339.32, and the plaintiff was required to sign a return receipt to obtain the letter containing such check. That the check was negotiated by plaintiff, but plaintiff claims that it did so without knowing that the check was intended to be a shut-in royalty check.

15. That again in June, 1980, another shut-in royalty check in the same amount was mailed to Hurley and the plaintiff again signed the receipt for such mail and negotiated the check, again claiming that it did not have knowledge of the intended purpose of the check.

16. That a shut-in royalty check was mailed to plaintiff in June of 1981, but was refused.

17. That some time prior to October, 1980, Sterlin Hurley, the Vice President and a principal shareholder of Hurley Enterprises, Inc., had a discussion with Tom Mueller, a former member of the Arkansas Oil and Gas Commission, and now a local gas businessman, about what had transpired, and Mueller advised Hurley that he thought that the lease should be cancelled. In October of 1980, Mueller wrote a letter for Mr. Hurley's signature demanding that another well be drilled "at once," or that the lease be cancelled. The Sun letter was mailed to the office of Sun's refining and pipeline company and was not received by defendant Sun or its parent company. In December, 1980, plaintiff's attorney wrote Sun demanding cancellation of the lease, and this letter was received, and after receipt of the letter, Sun responded, advising that shut-in royalty payments had been made and that workover operations were to begin shortly.

18. That during the discussions that Mr. Hurley had with Mr. Mueller, he agreed to lease the subject property to Mueller for a $45.00 per acre bonus, plus a three-sixteenths ($\frac{3}{16}$) royalty interest. Although this is less than what Hurley could now lease the property to others for, he testified that he had made a deal and would stick to it. The Court believes that Mueller is the instigator of this lawsuit and is the person responsible for the payment of the costs of litigation. The Court finds that plaintiff's interest in this matter is to obtain a new bonus payment plus a more favorable royalty arrangement in the event that Mueller is able to have the lease cancelled.

19. That Mr. Sterlin Hurley is an astute businessman with a great deal of knowledge about the affairs of life, including considerable knowledge of the "workings" of oil and gas leases and the oil and gas business and who, because of such knowledge, and because of his vast experience in banking, frequently consults with other landowners in the area who seek his knowl-

edge and expertise relative to these matters, and that, despite his advanced years, he has considerably more than average knowledge about matters such as these and, although the Court does not imply any wrongdoing, that Mr. Hurley has used, at the urging of Mr. Mueller, the difficulties that Sun has experienced at the Kettlehut-Shane Well # 1 to attempt to obtain a better lease for himself and Mr. Mueller.

## CONCLUSIONS OF LAW

Based on the above, the Court makes the following conclusions of law:

1. That the Court has jurisdiction of the subject matters and the parties hereto.

2. That the lease of the South Half (S ½) of Section 18, Township 9 North, Range 23 West, assigned to Sun, in spite of the non-production of the well drilled on such section, is held by production from other wells included within the Gulf lease.

3. That the plaintiff has failed to show that there has been any breach by Sun of its implied covenant to explore the premises and produce minerals in paying quantities from the lands covered by the lease in a proper manner and with reasonable diligence and, in fact, that the evidence shows that defendant Sun has been reasonable in such respects.

4. That the plaintiff is not entitled to have the lease cancelled and is not entitled to any relief herein.

For the reasons set forth above, a judgment will be entered in compliance with this memorandum opinion.