HADDOCK *v.* McCLENDON.

5-356                                              266 S. W. 2d 74

Opinion delivered March 29, 1954.

*Davis & Allen,* for appellant.

*Keith & Clegg,* for appellee.

WARD, J. This appeal raises this general question: What acts on the part of a lessee constitute a compliance with the provision to "commence drilling operations" before the expiration of an oil and gas lease?

On February 23, 1943 appellees, L. A. McClendon and Susie McClendon, executed a standard oil and gas "Commencement Form Lease," form No. 88, on certain lands to appellants, Fred T. Haddock and W. S. Bellows. The principal term of the lease was 10 years from the date of execution and was to be kept in force by the payment of yearly rentals, which in this instance were all paid, thereby extending the term of the lease to February 23, 1953. The lease also contained this paragraph:

"Notwithstanding anything in this lease contained to the contrary, it is expressly agreed and covenanted that if the lessee, his heirs, successors or assigns, shall *commence drilling operations* at any time while this lease is in force, this lease shall remain in force and effect, and the term and life shall continue as to the entire acreage described herein, *so long as such operations are prosecuted,* and if production results from such operations, then as long thereafter as such production continues." (Emphasis supplied.)

Apparently due to the fact that appellants were waiting on the outcome of nearby oil developments, or at least it is a fact, they did not see fit and did not attempt to drill an oil well on said lands until the attempt, as hereafter discussed, was made shortly before the expiration date of the lease. While appellants were engaged in an attempt, begun February 18, 1953, to proceed with drilling operations they were notified by appellees, on March 4, 1953, that the lease had terminated, and on March 14th following appellants filed this suit against appellees asking to have their title to the oil and gas lease quieted in them. Appellees filed a general denial and also specifically denied that Haddock and Bellows, as lessees, had "commenced or caused to be commenced drilling operations on the above described land which would operate to continue said lease in force and effect beyond the expiration of the primary term," and they ask that the said oil and gas lease be canceled, set aside and held for naught. On final hearing the chancellor dismissed the complaint and canceled the lease, giving, in part, the following reasons: Nothing was done by appellants until the closing days of the lease; appellants did not do what was necessary under the terms of the lease to protect their interest and prolong the life of the lease; and, apparently the purpose of appellants in starting the operations was to see what the result of a nearby well would be. It was further noted by the chancellor that had appellants "in good faith, gone in on the last day and entered upon this property and commenced to drill for gas or oil they would have had

their protection." From this decree appellants prosecute this appeal.

Although the testimony is in most part not in conflict we deem it necessary to set out portions of it hereafter in some detail.

Appellant Haddock is an oil producer who lives in Oklahoma and appellant Bellows is a general contractor who lives in Houston, Texas. Knowing that their lease from appellees would expire on February 23, 1953, and apparently being aware of the oil production near the leased land, they employed Mr. George Belt, a practical oil man in Oklahoma, early in January 1953, to come to Arkansas and drill a well 9,400 feet deep on the leased premises. Under instructions Belt offered to pay appellees a substantial sum of money if they would extend the expiration date of the lease for something like sixty days, but appellees refused to do this. Then Belt made inquiry with the view to obtaining a drilling rig which would be capable of drilling to a depth of 9,400 feet, which depth, it is conceded, will be necessary to drill in this instance with any hopes of striking oil or gas. Not being able to obtain such a rig readily Belt made arrangements with Warren and Hollyfield for a smaller drilling rig known as a "Cardwell Rig," which uses a cable. It is conceded by appellants that this rig is not capable of drilling the desired depth, but Belt says that he secured it only for the purpose of putting down about 200 feet of soil pipe in preparation for a larger drilling operation. Before the expiration date Belt made application to and secured a permit from the Arkansas Gas Commission to drill the well to a depth of 9,400 feet, and a few days before drilling operations started on February 18th Belt built a road up to the drilling site. This road would take care of ordinary heavy traffic but was not in shape to take care of a heavy drilling rig such as would eventually have to be used. The Cardwell rig was moved on location on February 18th and after encountering many difficulties, including quicksand, they were able to drill about 30 feet by February 23rd and had drilled to the depth of 52 feet by March 12, 1953, but were not able to install all of the surface pipe.

For a reversal, the principal contention of appellants is stated in this way:

"The employment of a cable tool drilling rig for the purpose of setting surface casing on the lease, and the actual making of a hole with that equipment constituted drilling operations while this lease was in force."

In support of this contention they cite the following authorities: *Jackson* v. *Gilbert,* 216 Ark. 501, 226 S. W. 2d 59; *Winn* v. *Collins,* 207 Ark. 946, 183 S. W. 2d 593; *Allen* v. *Palmer, et al.,* 201 Okla. 673, 209 Pac. 2d 502; and *Mc-Callister, et al.* v. *Texas Company,* (Tex. Civ. A.) 223 S. W. 859.

The *Jackson* case, *supra,* dealt with a coal mining lease where it was alleged that the lessee had violated a provision of the lease requiring him "to begin the establishment of a plant within the first year." The expiration date was January 1st and it was shown that appellee began stripping overburden with a bulldozer on the previous December 21st and removed 4 tons of coal on December 23rd; then, deciding the bulldozer was not suitable, he brought in a dragline on December 30th; and appellee had installed two boxes, dragline cover and shed. In denying cancellation of the lease we said:

"We think the requirement is met by the installation of such machinery and equipment as are appropriate to the development of the leasehold. The lease itself permits the lessee to remove the top vein of coal 'by the steam shovel process or other equally good processes.' "

The *Winn* case, *supra,* deals with the expiration clause in a bauxite mining lease. The lessee there had until April 29, 1943 to begin active mining operations. The proof showed that on February 7th test mining began and that in the early part of April a shaft was being sunk to see if bauxite could be mined in that way and it was discovered that they could only mine by open pits. On April 28th a scraper and tractor were in use removing the overburden. Although no bauxite had been mined we held the above facts showed "that active mining operations began in due time."

The *Allen* case, *supra,* involving an oil and gas lease, deals with a question similar to the one presented here. Apparently this case is cited by appellants to show that it is not necessary to have a complete drilling outfit on the ground before the expiration date. There the court posed the question this way:

"The decisive question presented is whether Allen commenced the actual drilling of an oil and gas well upon the property covered by the lease on or before April 26, 1947."

The proof showed that Allen set up a rig one day before the expiration date and drilled 6 feet in rock; that he was unable to get a connection made for fuel gas until April 29th but supplied gas by small containers; that they were unable to connect up a water line until May 5th; and that they did not have surface casing. In refusing to declare a forfeiture of the lease the court said:

"We are cited to no case by plaintiffs, and we know of none, holding that actual drilling of an oil and gas well is not in fact commenced until, as contended by plaintiffs, all the equipment, machinery and materials necessary to drill and complete the well have been placed upon the leased property. In fact from the testimony of witnesses produced by both parties, it appears that it is not customary, prior to commencing drilling operations, to have upon the land everything necessary to complete the well."

In the *McCallister* case, *supra,* the forfeiture clause in the oil and gas lease stated that "operations for the drilling of well for oil or gas shall be begun within 2 years . . ." The lease would have expired on August 19, 1918, the lessee began operations to drill on July 13, 1918, but actual drilling started on September 14, 1918. The preparations to drill consisted of selecting and locating a place, hauling derrick timbers to the site, and providing a water supply for drilling purposes. The court there held that such preparations satisfied the provision in the lease requiring that operations for drilling should begin, and refused to cancel the lease. It is true that in the cited case the court found that operations continued with diligence

until May 13, 1919, at which time oil was found. In the *McCallister* case, *supra,* the court also stated that "forfeitures are not favored by law and if the language is fairly susceptible of an interpretation which will prevent a forfeiture it will be so construed," citing *Brown* v. *Insurance Company,* 89 Texas 590, 35 S. W. 1060.

To sustain the decree of the trial court appellees state that the provisions of oil and gas leases should be construed more strongly against the lessee and in favor of the lessor, citing *Anderson* v. *Talley,* 199 Okla. 491, 187 P. 2d 206. In this same connection appellees point out that formerly a "Completion Form Lease" was in common use, which in general provided that leases would forfeit unless there was actual production before the end of the primary term fixed in the lease, but that the lease under consideration is one of those which has later become known as a "Commencement Form Lease" which permits a lessee to continue with due diligence the drilling of a well commenced before the expiration of the primary term.

However, appellees' principal contention for an affirmance is set forth in their own language, to-wit: "Good faith drilling operations as contemplated by the parties to the lease were not performed by the lessee." To support this contention they cite *Wickham, et al.* v. *Skelly Oil Company,* 106 Fed. Supp. 61, affirmed by the United States Court of Appeals, 10th Circuit, on February 9, 1953, 202 Fed. 2d 442; 12 Am. Jur. 667; Vol. 2, Summers Oil and Gas, at page 260; *Mansfield Gas Company* v. *Alexander,* 97 Ark. 167, 133 S. W. 837; and *Huggins* v. *Daley,* 99 Fed. 606.

In our opinion the decree of the trial court in this case cannot be affirmed on the basis of "good faith," or rather the lack of good faith. As we view this case the question of diligence or lack of diligence is also related to the question of good faith or lack of good faith.

A full discussion of appellees' authorities would serve no useful purpose. It suffices to say: The *Wickham* case, *supra,* is to the effect that the lease here would expire on

February 23rd, but if before that date drilling was begun and continued until production was obtained the lease would be revived; the *Am. Jur.* citation says it is implied that *good faith* must be used in performing written obligations; and the *Huggins* opinion, *supra,* says there is an implied obligation on the lessee to use *diligence* in search and operation.

It appears decisive therefore to apply the tests of *good faith* and *diligence* to the facts and circumstances of this case.

*Good Faith.* We are not convinced that the evidence shows a lack of good faith on the part of appellants. They had a right, as held in the *Allen* case, *supra,* if they wanted to do so, to wait until one day before February 23rd to start drilling, and the fact that they may have been waiting on the outcome of nearby operations is immaterial. The lease imposed upon appellants not only the duty to commence drilling operations before February 23rd but also the duty to discover oil or gas, otherwise the lease would be void. Good faith in this instance therefore must mean, or at least include, their intention to drill a well to the production sand which it is agreed was 9,400 feet deep. Good faith relates to intent, and if appellants didn't intend to drill 9,400 feet then they must have intended to throw away over $5,000 which they spent on what they did do. We are loath to believe they had the latter intent, and it is not deducible from the testimony.

*Diligence.* We agree with appellees that appellants would have been obligated to use diligence [though not specifically required in the lease] in their attempt to drill an oil well to completion. They would have had no right to delay operations for the purpose of waiting on the outcome of other oil developments, but that situation did not develop here because appellants were, in effect, stopped by appellees' letter of March 4th. We have no way of knowing what diligence appellants might have used after that date, or after this suit was filed on March 14th. So the question: Should the lease be canceled because of appellants' lack of diligence in doing what they did here?

We do not think so. Appellants had a right, as we have mentioned, to wait until practically the last day to begin drilling, and cannot therefore be penalized for lack of diligence on that account, and since they were stopped by appellees on March 4th, the question of diligence thereafter never arose.

Appellees' witnesses stated that they visited the drilling location several times when the men didn't seem to be working, and it is evident the drill crew did not work 24 hours a day, but it would be a dangerous precedent to say these facts justify cancellation of a lease on the ground of lack of diligence. It is true the evidence reflects that ordinarily more progress would have been made in the same time than was made here by appellants, but Belt explains the difficulties they had with quicksand and in lowering the surface pipe, and it is not shown that the same difficulties might not have occurred with a larger drilling rig.

Appellees attach importance to the fact, admitted by appellants, that the cable rig used in this instance was not suitable to drill 9,400 feet. Appellants' explanation of course is that they only intended to use the cable rig to set 200 feet of surface pipe and then proceed with a proper rig. We have no way of knowing what appellants would have done had they been permitted to set the surface pipe, but their apparent experience and financial standing preclude an assumption they would not have proceeded properly. The testimony indicates that setting soil pipe is a necessary step in the drilling of an oil well.

In our opinion, the decision of the trial court that appellants' activities did not comply with the lease provision to "commence drilling operations," is not supported by the weight of the evidence.

Reversed.

Justice George Rose Smith dissents.