VICKERS v. PEAKER.

5-1231                                    300 S. W. 2d 29

Opinion delivered March 25, 1957.

*Homer T. Rogers* and *Davis & Allen,* for appellant.

*Keith, Clegg & Eckert, L. B. Smead,* and *Harry Crumpler,* for appellee.

ED. F. McFADDIN, Associate Justice.  From a decree of the Chancery Court refusing the plaintiffs' prayer for cancellation of a certain instrument as a cloud on the title, there is this appeal.  The equities preponderate in favor of the appellees.

The appellants are R. H. Vickers and his two sisters, Mrs. Humphreys and Mrs. Gray.  They were plaintiffs below.  As lessees, they own and operate an oil and gas lease (known as the "Murphy lease") on 40 acres; described as the SW¼ NW¼ Sec. 28, Twp. 15 S, R 15 W, Ouachita County, Arkansas.  On this lease there are four oil wells producing from the Blossom Sand, which is at the approximate depth of 2,400 feet.  In order to have determined the possibility of production from the sands at a greater depth, appellants on July 21, 1955 executed an assignment[1] to Edward McNeil, granting the

---

[1] The said assignment (on which appellants' suit is based) was prepared by attorneys for appellants, and the part here involved, reads: "Unless the Assignee, his heirs or assigns, commence the drilling of a well in search of oil and/or gas in Section 27 or Section 28, Township 15 S, Range 15 W, on or before September 15, 1955, and drills and completes the same with reasonable diligence to a depth sufficient to test the Smackover lime formation, this Assignment shall *ipso facto* become null and void and of no effect and all the rights of Assignee herein, his heirs, or assigns, shall terminate and cease. And there is a further condition under which this Assignment is given that all the rights of the Assignee herein, his heirs or assigns, shall cease, terminate, become null and void, unless said Assignee, his heirs, or assigns, shall drill and complete a well or wells for actual production of oil and/or gas in commercial quantity therefrom on the lease herein assigned within 12 months from date of this assignment.

"There is excepted from this conveyance and reserved unto the Assignors herein, their heirs and assigns, all of the oil, gas and other minerals in, on and under said lands belonging to their leasehold interest from the surface to a depth of 3,000 feet, and the Assignee herein shall not interfere in his operation with the operation and any development that may be carried on by Assignors, their heirs or assigns to said depth of 3,000 feet.

"Assignors herein except from this conveyance and serve unto themselves, their heirs and assigns 1/16 of 7/8ths of all the oil and gas (including distillate) which may be produced and saved from the land described in the lease herein assigned, to be paid to them as a free perpetual overriding royalty out of production from said lands and shall be paid to said Assignors, their heirs, successors or assigns, without cost of discovery, marketing or removal of same and taxes, save severance taxes."

right to explore the formations below 3,000 feet on the said 40-acre tract.

Appellee, Peaker, holds under the aforesaid McNeil assignment.[2] Somewhat similar assignments were executed by others holding interests in the said Sections 27 and 28; and appellee, Peaker, became the holder of enough of these assignments to justify him in testing the formations below 3,000 feet in said Sections 27 and 28. Peaker first drilled a well in the SE¼ NE¼ of Section 28, known and referred to herein as the "Berg well."[3] He made a contract with Al Grandebush, a recognized driller, to drill the Berg well to a depth of 5,000 feet and to complete it in the Smackover lime. The contract price was $20,000. The time of commencement of this well will be discussed in Topic I, *infra*.

Grandebush drilled this Berg well to a depth of 3,416 feet, but was unable to carry the well to a greater depth; so he started a new well in the SW¼ NW¼ of Section 27, one-quarter mile to the East, and known as the "Reynolds Brothers well."[4] He actually drilled the Reynolds Brothers well to the Smackover lime. The failure to drill the Berg well to the Smackover lime and the drilling of the Reynolds Brothers well to that formation will be discussed in Topic II, *infra*.

When Grandebush found that he was unable to drill the Berg well to a depth greater than 3,416 feet, he tested the sand at that depth and brought in a producing oil well. That sand at 3,416 feet is now known as the "Cotton Valley Sand"; and the Berg well was the discovery well of the Cotton Valley Sand in Sections 27 and 28. When Grandebush drilled the Reynolds Brothers well to the Smackover lime (approximate depth 4,800 feet), he found said formation to be non-productive; so he made the Reynolds Brothers well into a com-

---

[2] There are other appellees who claim by, through, or along with Peaker; but for convenience we refer to Peaker as the principal appellee, since he was the one who undertook to fulfill the requirements of the said assignment executed by Vickers, et al.

[3] This was only one-half mile from the Murphy lease held by appellant.

[4] This Reynolds Brothers well was only one mile from the Murphy lease operated by appellant.

mercial producer from the Cotton Valley Sand. This was on January 18, 1956.

Peaker then prepared to drill on the Murphy lease here involved (SW¼ NW¼ Section 28).[5] On May 5, 1956, appellant, Vickers, and his sisters, filed the present suit to cancel the McNeil assignment under which Peaker claimed. The complaint alleged that the terms of the assignment had been breached by (1) failure to commence the Berg well on September 15, 1955, and also by (2) failure to drill the Berg well to the Smackover lime. Peaker and the other appellees denied both of the said claims; and also made the affirmative defense of laches and estoppel (which will be discussed in Topic III, *infra*). The Trial Court dismissed the Vickers suit for want of equity, and this appeal ensued: presenting the three points now to be discussed.

I. *When Did Drilling Commence On The Berg Well?* Appellants say: (1) that the McNeil assignment (under which Peaker claims) required that the drilling of the Berg well be commenced on or before September 15, 1955; (2) that the actual spudding in of the well was not until October 15, 1955; and (3) that, therefore, the assignment executed by appellants expired for failure of the assignee to perform its conditions. Appellants cite and strongly rely on our case of *Vaughan* v. *Doss,* 219 Ark. 963, 245 S. W. 2d 826, wherein we discussed the "unless" type of lease; and appellants point out that this is an "unless" type of assignment.

The record herein establishes the following: (1) some time prior to September 12, 1955, Peaker entered into a contract with Al Grandebush, whereby Peaker agreed to pay Grandebush $20,000 to drill the Berg well, and Grandebush agreed to drill the well to the Smackover lime, estimated to be between 4,800 and 4,900 feet below the surface; (2) on September 12, 1955, the location was surveyed and cleared; (3) on September 13th a road was constructed to the location; (4) on September 14th a permit was obtained from the Arkansas

---

[5] He was required under the terms of the assignment from Vickers to McNeil to drill a well on the Murphy lease within twelve months from **July 21, 1955.**

Oil & Gas Commission to drill the Berg well; (5) by September 15th certain material had been moved to the drill site for the well, including drill pipe, butane tanks, pipe racks, and other material; (6) the entire equipment had been moved to the drill site by October 13, 1955, and on that day actual drilling commenced by the drill bit piercing the earth; (7) in the early part of November, 1955, the well had reached a depth of 3,416 feet, when sand was encountered in such quantities as to cause the mud pump to go out of commission; (8) on November 22, 1955, the Berg well was completed as a producer from the Cotton Valley Sand at 3,416 feet.

Appellees argue that all of these matters taken together mean that drilling commenced on or before September 15th. Appellants say that drilling commenced only on October 13th, the day the drill bit actually pierced the earth. Which argument is correct? Does "drilling" commence with the operations for a well, or does it commence only with the piercing of the ground with the drill bit? Does "baking a cake" begin with the preparation of the dough, or only with the actual placing of the dough in the oven? In *Haddock* v. *McClendon*, 223 Ark. 396, 266 S. W. 2d 74, we had a somewhat similar question presented and, in refusing to declare the lease forfeited, we reviewed a number of cases and quoted from one of them in this language:

" 'We are cited to no case by plaintiffs, and we know of none, holding that actual drilling of an oil and gas well is not in fact commenced until, as contended by plaintiffs, all the equipment, machinery and materials necessary to drill and complete the well have been placed upon the leased property. In fact from the testimony of witnesses produced by both parties, it appears that it is not customary, prior to commencing drilling operations, to have upon the land everything necessary to complete the well.' "

In considering all of the facts as recited herein, and considering also the estoppel issue hereinafter discussed in Topic III, *infra,* we reach the conclusion that the appellants cannot successfully claim that their as-

signment was forfeited in this case for failure to have the drill bit pierce the earth by September 15, 1955.[6]

II.  *What Of The Failure To Drill The Berg Well To The Smackover Lime?*  Appellants insist that the McNeil assignment they executed was forfeited because of the failure of Peaker to drill the Berg well to the Smackover lime.  The portion of the assignment germane to this point reads:

"Unless the assignee . . . commence the drilling of a well . . . on or before September 15, . . . and completes the same . . . to a depth sufficient to test the Smackover Lime Formation . . ."  Appellants point out that the Berg well was the only well that Peaker could claim to have been commenced on or before September 15th; and that said well admittedly did not go to the Smackover lime.  Therefore, appellants claim that their assignment is null and void.

Appellees insist that Peaker did begin the Berg well on or before September 15th, that Peaker was prevented by an unavoidable casualty from drilling the Berg well to the Smackover lime; and that immediately upon said casualty, Peaker began the drilling of the Reynolds Brothers well which went to the Smackover lime.  Appellees claim "substantial compliance" with the assignment.  Regarding unavoidable casualty: appellees showed that when Grandebush reached the depth of

---

[6] In Summers on "Oil and Gas," permanent Edition, § 349, the rationale of the holdings is summarized in this language: *"Beginning or Commencement of a Well or Drilling Operations.*  Where the lessee covenants to begin or commence a well or drilling operations within a certain definite time, and his failure to do so places him under a liability to have the lease forfeited, or a duty to pay delay rental, it becomes necessary to determine what act or acts of the lessor will satisfy this requirement.  *The general rule seems to be that actual drilling is unnecessary,* but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, *when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well,* constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease.  If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to completion of a well, *the intent with which he did the preliminary acts are unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease."*  (Italics supplied.)

3,416 feet in the Berg well he ran into so much sand that his mud pump was put out of commission[7]; that it was necessary to have the mud pump sent to Magnolia for repairs; that when the mud pump was put back into operation, Grandebush was unable to get circulation[8] of mud in the drilling of the Berg well. Grandebush testified that he could not afford to continue the drilling of the Berg well until he could get circulation; that his drill stem might become stuck in the sand; that if he tried to pull the drill stem, the derrick might collapse and some of his workmen might be killed or injured. Grandebush testified that he made all of these representations to Peaker; that Peaker still insisted that the Berg well be completed to the Smackover lime; but that finally Peaker reluctantly agreed that a new well (that is, the Reynolds Brothers well) could be drilled to the Smackover lime in lieu of the Berg well being drilled to that depth. The actual drilling of the Reynolds Brothers well commenced on November 15, 1955; the Berg well was not completed as a producer until November 22nd; the Reynolds Brothers well was drilled to the Smackover lime and found unproductive; and then later brought in as a producing well at the Cotton Valley Sand on January 18, 1956. With these facts thus detailed, we leave the second point to go to the matter of estoppel which, coupled with the facts heretofore recited, shows the equities to proponderate in favor of the appellees.

III. *Estoppel.* We have heretofore stated that the equities preponderated in favor of the appellees; and we now come to that point. The appellant, Vickers, testified that prior to July, 1955 no well had ever been drilled to the Smackover lime in Sections 27 or 28; that he executed the assignment to McNeil (under which ap-

---

[7] Grandebush testified that a mud pump cost about $28,000.00.

[8] "Circulation of the mud" in a rotary drilling well is a matter of extreme necessity. As the hole is being drilled the mud pumped in the well operates to seal the hole against cave-ins. Unless some portion of the mud be returned to the surface, it becomes evident that the mud is going into some porous formation and is not sealing the hole. The returning of a portion of the mud to the surface is called "circulation." Because the mud pump had to be repaired, the Berg well stood without operation for some time and when the mud pump was reinstalled, Grandebush was never able to get circulation again.

pellee, Peaker, holds) in order that a block of sufficient size could be assembled to justify someone to test the Smackover lime; and that he was willing to make his assignment to McNeil to enable such a test to be made. From this, and other evidence in the record, it is clear that Vickers knew that Peaker, in drilling the Berg well and the Reynolds Brothers well, was relying on the validity of the Vickers Assignment to McNeil. Vickers also testified that he visited the location of the Berg well several times; that he knew at all times of the drilling by Peaker of the Berg well and the Reynolds Brothers well; and that, based on information obtained from these wells, Vickers was enabled to successfully drill two wells to the Cotton Valley Formation on another tract in Sections 27 and 28 near the Murphy lease that Vickers was operating. From this evidence it is clear that Vickers used the information from the Berg well and the Reynolds Brothers well to successfully drill wells for himself. Vickers also admitted that he was not damaged in any way, nor his rights prejudiced in any way, by the delay of Peaker in drilling the Berg well or the Reynolds Brothers well to the Smackover lime; that it was not until April 24, 1956 that Vickers first notified Peaker that Vickers considered as forfeited the assignment from Vickers to McNeil; and that this was after Peaker had made a location and started a right-of-way on the Murphy lease.

From the foregoing it is clear that Vickers sat by and remained silent and allowed Peaker to expend at least $40,000 in testing the Smackover lime and proving the Cotton Valley formation to be productive (all of which information was valuable to Vickers), before Vickers ever indicated in any way that he was going to make any claim of any forfeiture of his assignment under which he knew Peaker was holding and claiming.

In *Bray* v. *Woodley,* 162 Ark. 186, 258 S. W. 119, we held that a landowner could waive the forfeiture of a lease by accepting the delay rentals. In *Hodges* v. *Harrell,* 173 Ark. 210, 293 S. W. 25, we held that the provision in an oil and gas lease for forfeiture for failure to drill within the stated time was waived when the

landowner permitted the well to be drilled after the stated time. In *Keylon* v. *Arnold,* 213 Ark. 130, 209 S. W. 2d 459, we discussed equitable estoppel by silence and quoted from 19 Am. Jur. 661:

"An estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. Estoppel by silence or inaction is often referred to as estoppel by 'standing by,' and that phrase in this connection has almost lost its primary significance of actual presence or participation in the transaction and generally covers any silence where there are a knowledge and a duty to make a disclosure. The principle underlying such estoppels is embodied in the maxim 'one who is silent when he ought to speak will not be heard to speak when he ought to be silent.' "
In *Johnson* v. *Spencer,* 222 Ark. 710, 262 S. W. 2d 290, we also discussed equitable estoppel by silence. The cited cases conclusively show that all the equities in the case at bar are against the appellants.

We have given these facts in detail because this is not an ordinary oil and gas lease case where the landowner signs a lease form prepared by the lessee; but this is a case in which two experienced operators in the same field are in litigation with each other, and Vickers' attorney prepared the instrument here involved. Vickers is trying to use the language of that instrument to affect a forfeiture against Peaker, and yet Vickers knew all the time that Peaker, in reliance on the validity and continued existence of the assignment, made large expenditures. Vickers profited by the information he received from such expenditures; and after gaining all this information he now seeks to cancel the instrument he executed, when he admits that he has not been damaged by any delay that he claims Peaker made.

In view of all of these equities, we conclude that the Trial Court was correct in dismissing the complaint for want of equity. Affirmed.