Jim PHYFER, Plaintiff–Appellant,

v.

SAN GABRIEL DEVELOPMENT CORP., Defendant–Appellee.

No. 88–4690.

United States Court of Appeals, Fifth Circuit.

Sept. 28, 1989.

**236**

Leslie H. Southwick, John M. Grower, Jackson, Miss., for defendant-appellee.

Before WISDOM, RUBIN, and KING, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue is whether the lease of an oil and gas well terminated automatically upon the lessee's breach of its terms and, if not, whether, under Mississippi law, the lessor waived or is estopped to assert his right to recover possession of the well. The district court correctly held that the lease did not terminate automatically, and that the lessor, by his course of conduct, is estopped to terminate the lease.

### I.

Jim Phyfer owned the Thomas D. Smith 9–2 No. 1 oil and gas well and approximately 3,500 acres of land surrounding the well in Holmes County, Mississippi. Neither Phyfer nor the well's original owner, Patrick Petroleum Company, had accomplished production from the well.

In July, 1983, Phyfer leased the well and the surrounding property to Matrix Energy, Inc. In a letter agreement drafted by Phyfer, Matrix agreed to pay Phyfer $100,-000 in the stock of another corporation for the right to place and maintain the well in production by August 1, 1985, or to purchase, for an additional $100,000, the opportunity to start production two years later, by August 1, 1987. The agreement invested Phyfer with an overriding royalty interest in any oil, gas, and minerals produced. If, however, Matrix did not start production by the original deadline and failed to obtain an extension, or obtained an extension but failed to meet the extended target date for commencing production, it was obliged to assign the well and land back to Phyfer.

Matrix did not pay Phyfer the $100,000 in stock. After a federal district court had

Michael E. Earwood, Jackson, Miss., for plaintiff-appellant.

determined that Matrix had breached the contract by failing to make this payment, the parties agreed to a settlement of the $100,000 claim by which Matrix would pay Phyfer $80,000 cash in two installments. Matrix paid Phyfer the first $20,000 installment immediately as agreed, but never paid the remaining $60,000.

Matrix commenced production on the Smith well in April, 1985, but, in ten weeks, had produced only 1,103 barrels of oil and 36,279 mcf. of gas. Matrix then shut down the well, concluding that continued production was not economically feasible, and that the sulphur extraction plant, used to treat the natural gas emitted from the well, required improvement before production could resume. Matrix neither sought an option to extend its time to maintain production nor attempted to improve either the well or the extraction plant.

Matrix subsequently filed for bankruptcy under Chapter 11, and in September, 1986, the bankruptcy court issued an Order of Abandonment assigning Matrix's interest in the Smith well to the San Gabriel Development Corporation. During the next year, San Gabriel spent approximately $2,000,000 purchasing and installing surface and sulphur extraction equipment at the well, renovating and starting-up the adjacent Tchula Lake Gas Extraction Plant, and building pipelines from the well to the plant. San Gabriel commenced production from the Smith well in December, 1986.

Meanwhile, on October 10, 1986, Phyfer informed San Gabriel that he had been unaware of Matrix's bankruptcy and had not been apprised of San Gabriel's acquisition of the well. He demanded that San Gabriel satisfy Matrix's outstanding debt to him and affirm in writing his overriding royalty interest in the well and leases, and threatened to rescind the 1983 agreement if San Gabriel refused. Two weeks later, Phyfer filed a royalty proof of claim with the bankruptcy court requesting that the well be assigned to him. During the next several months, however, Phyfer and San Gabriel negotiated the amount of Phyfer's overriding royalty interest in the Smith well.

In March, 1987, Phyfer filed this suit, claiming that the 1983 agreement had terminated automatically when Matrix breached it, and that ownership of the well and the right to use the surrounding land had, therefore, reverted to him in 1983. The district court found that Matrix had breached the 1983 agreement by not paying Phyfer the price originally specified and by failing to obtain production by August 1, 1985. The court held, however, that the agreement did not terminate automatically; to recover for Matrix's breach, Phyfer had to file suit for breach of the lease or for its forfeiture. The court found that by asking for written affirmation of his royalty interest and subsequently negotiating with San Gabriel over the amount of royalties to which he was entitled, Phyfer did not give San Gabriel notice of his claim for termination of the lease, but to the contrary, indicated that the 1983 agreement was still in effect. The court held that, by his conduct, Phyfer had assented to San Gabriel's continued operation of the well under the 1983 agreement, waived his claim that Matrix had forfeited its interest in the well and leases, and was estopped to assert that the assignment had terminated.

Phyfer appeals, claiming that the 1983 agreement automatically terminated on Matrix's breach so that the well and leases reverted to him without the need for filing suit. Alternatively, Phyfer claims that the district court should not have rendered summary judgment declaring that he had waived his forfeiture claim, that he had not, in fact, waived this claim and should not be estopped to assert it, and that San Gabriel should not have been permitted to amend its original answer.

## II.

San Gabriel does not dispute that Matrix breached the 1983 contract repeatedly. Matrix paid neither the original nor recalculated consideration for the assignment of the well and leases. Although Matrix placed the well in production for ten weeks, it subsequently discontinued production for more than 15 months, without repairing or improving the well or the sulphur extrac-

tion plant, thus violating its contractual obligation to "maintain the well on production as a prudent operator."[1] Having failed to maintain production by August 1, 1985, and having failed to extend its expiration date until August 1, 1987, Matrix also breached its duty to "assign to [Phyfer] its right, title, and interest" in the well and leases; instead, it permitted the bankruptcy court to assign these rights to San Gabriel.

Phyfer claims that Matrix's numerous breaches caused the contract to terminate automatically and ownership of the wells and leases to revert automatically to him, obviating any need for a suit. Resolution of this claim turns on interpretation of the 1983 agreement between Phyfer and Matrix.

■ Mineral lease agreements generally contain a clause enunciating the circumstances under which the lease will terminate. The oil and gas industry has distinguished between two primary types of termination provisions: "unless" clauses and "or" clauses. An "unless" clause typically provides that if drilling has commenced on a certain property or well by a specified date, the

> lease *shall terminate ... unless* the lessee on or before that date shall pay ... to the lessor ... the sum of _____ dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for [____] months from said date.[2]

A contract containing such an "unless" clause does not oblige the lessee to drill or pay a rental fee, and does not render the lessee liable for damages should he fail to drill within a specified time.[3] Instead, the lease, by its terms, terminates automatically, *"ipso facto*, without necessity of demand or notice on the part of the lessor,"[4] and title to the property reverts to the owner.

■ Other leases contain what is eponymously called an "or" clause. Such a clause usually provides:

> Lessee agrees to commence a well on said premises on or before ... [a certain] date ... *or* pay ... to lessor ... _____ dollars, which payment ... shall secure the privilege to the lessee to defer the commencement of drilling operations for a [certain] period.[5]

Under such an agreement, the lessee "enter[s] into a covenant ... either to commence drilling operations or to pay a specified sum to the lessor."[6] Failure to do one or the other—that is, to drill or to pay the specified delay rental—does not, however, automatically terminate the lease. To obtain relief for the lessee's failure to drill or pay, the lessor must sue for breach of contract, requesting either damages for the lessee's violation or forfeiture of the lease.[7]

■ As the district court observed, the 1983 agreement between Phyfer and Matrix is a "hybrid" containing aspects of both the "or" and "unless" clauses. It provides in part:

> [Matrix] shall have a period until August 1, 1985, in which to place the ... Smith Well on production as a prudent operator.

---

1. *Cf. Frost v. Gulf Oil Corp.*, 238 Miss. 775, 119 So.2d 759, 761–64 (1960); *Champlin Petroleum Company v. Mingo Oil Producers*, 628 F.Supp. 557, 560–61 (D.Wy.1986), *aff'd*, 841 F.2d 1131 (10th Cir.1987).

2. 3 Kuntz, Oil and Gas § 29.2, p. 33 (1967) (emphasis supplied).

3. *Id.* at 33–34.

4. *Id.* at 35 (footnote omitted); 3 Williams, Oil and Gas Law § 605.2, pp. 96–98 (1988); 3 Summers, Oil and Gas § 452, pp. 115–22 (1958); 38 Am.Jur.2d § 124, pp. 591–92; *see Good Hope Refineries, Inc. v. Benavides*, 602 F.2d 998, 1001 (1st Cir.), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *Haby v. Stanolind Oil and Gas Co.*, 228 F.2d 298, 307 (5th Cir. 1955); *In re P.I.N.E., Inc.*, 52 B.R. 463, 446–67 (W.D.Mich.1985).

5. 3 Kuntz § 29.3 at 36 (emphasis supplied) (footnote omitted).

6. *Id.* at 36–37; 3 Williams § 607 at 198.4; 3 Summers § 440 at 73–77; 38 Am.Jur.2d § 124 at 593.

7. *See* 3 Kuntz § 29.3 at 37–38; 38 Am.Jur.2d § 124 at 593; *Fuller v. Rainbow Resources, Inc.*, 744 S.W.2d 232, 234 (Tex.App.—Texarkana 1987).

[Matrix] shall cause good delivery [to Phyfer] on or before August 15, 1983 ... shares of the common stock of Xenerex Corp. ... total[ling] $100,000....

Should the Smith Well not be on production on or before August 1, 1985, [Matrix] shall have the option to acquire an additional period of time until August 1, 1987, in which to place the well on production by the payment of $100,000 ... to [Phyfer]. Failure to cause the well to be in production ... before August 1, 1985, or to pay the above consideration for an additional period until August 1, 1987, or having obtained the additional time until August 1, 1987, and having failed to cause the well to be timely in production, *will result in [Matrix's] obligation to assign to [Phyfer] all [of Matrix's] right, title, and interest* in all of the Oil, Gas and Mineral Leases in the Area of Mutual Interest ... and the Smith Well and the equipment therein and thereon to be delivered in the same condition as when originally delivered to [Matrix] ...

[Matrix] agree[s] to make any assignments of any interest in the said leases expressly subject to the terms of this letter agreement (Emphasis added).

The lease *neither requires the lessee to drill or pay delay rentals nor provides for termination upon Matrix's failure to do so.* Instead, it departs from both the "or" and "unless" clauses by imposing on Matrix an "obligation to assign" the well and property to Phyfer should Matrix not drill or pay delay rentals.

Imposing on Matrix an obligation to assign the interests it has acquired is not the same as automatically terminating the lease. A termination provision in an "unless" clause is "self-operating"; the lease is terminated and property is transferred automatically from a lessee to a lessor when certain conditions are not met.[8] The "forfeiture" provision in the 1983 agreement imposes an affirmative obligation on Matrix to act—to "assign" leases to Phyfer—should it not comply with certain conditions enunciated in the letter. Matrix may or may not fulfill its contractual duty to assign the well and leases to Phyfer. The 1983 agreement between Matrix and Phyfer does not provide, explicitly or implicitly, for its automatic termination or for the automatic transferral of property and, therefore, lacks the one element indispensible to establishing the existence of an "unless" clause.[9] If Matrix fails to assign Phyfer the well and leases, Phyfer may sue Matrix for breaching a covenant in the contract, and seek either to recover damages for Matrix's failure to pay rental fees or to regain ownership of the property by forfeiture.[10]

### III.

Without distinguishing between waiver and estoppel, the district court held that Phyfer had both waived and was estopped to assert his right to seek to enforce the "forfeiture" provision in the 1983 agreement. The district court appropriately decided this issue on summary judgment. There is no genuine dispute over the historical facts that informed the district court's determination. The only question is how to interpret these facts and give them legal effect.

When a lessee fails to drill or pay a rental fee under a lease containing an "or" drilling clause and a "forfeiture" provision, the lessor may either "enforce the covenant to pay rentals or ... declare a forfeiture[; h]e cannot do both."[11] A court may determine from the lessor's conduct either that he has waived or that he is estopped to assert his right under a forfeiture clause "[i]f the essential elements of ... [either] equitable doctrine are present."[12]

8. 3 Kuntz §§ 29.1, 29.3 at 32, 37; 3 Williams § 607 at 198.4; *Rainbow Resources,* 744 S.W.2d at 234; *Irwin v. Marvel Petroleum Corp.,* 365 P.2d 221, 223 (Mont.1961).

9. *See* Kuntz §§ 29.4(b), 31.4 at 44, 59.

10. *See* 3 Kuntz § 29.3(e) at 41.

11. *Ibid.* (portions of text and footnotes omitted); *see id.* § 31.4 at 57–59; Summers § 440 at 75–76.

12. 3 Kuntz §§ 29.3(d), 36.2, 36.4(a), 36.4(c) at 40, 192, 199, 202.

Waiver is the voluntary relinquishment of a known right.[13] Estoppel, on the other hand, is a delictual doctrine that prevents a party from profiting either by misleading another party to act to its detriment or by remaining silent while another party, upon a mistaken belief, deals with the first party's property or incurs some liability towards it.[14] Under Mississippi law, applicable in this diversity-jurisdiction case, a lessor who accepts delay rentals or royalty payments after the term of the lease has expired, or who " 'permit[s] a continuance of the prosecution of the enterprise and the expending of money therein by the lessee[ ] after knowledge of the breach of a condition on which the lease might have been forfeited,' " may have waived or be estopped to assert a forfeiture.[15]

■ It is evident that Phyfer did not knowingly relinquish or waive his right to seek a forfeiture.[16] After Matrix had breached the renegotiated lease in August, 1985, Phyfer did not receive or accept delay rentals or royalty payments, and in communications with San Gabriel and the bankruptcy court during the fall of 1986, he repeatedly reserved his right to seek forfeiture of the leases.

■ While he may not have waived his right to seek a forfeiture, Phyfer's course of conduct from the time of Matrix's first breach of the agreement in August, 1985 through March, 1987 conveyed to San Gabriel the impression that the 1983 agreement could still be maintained in effect.

In August, 1985, after Matrix had failed to pay the initial consideration, Phyfer did not seek to terminate the 1983 agreement and demand Matrix's forfeiture of the leases, but instead, renegotiated the amount and schedule of Matrix's payment. Similarly, after learning of San Gabriel's acquisition of the well and leases, Phyfer wrote to San Gabriel on October 10, 1986:

> I have discovered ... [that] the Gas Plant, Pipeline, and the Smith No. 9–2 well together with all the oil, gas and mineral leases have been purportedly assigned and transferred.... I would have had a first lien on the above property....
>
> Unless, on or before ten (10) days from [the] date [of this letter], I have received payment in full of the monies owed me plus interest to date and a written affirmation from San Gabriel Corporation of my overriding royalty interest in the area of mutual interest as defined in the agreement with Matrix, I will undertake to protect my legal rights by filing the appropriate pleadings in the U.S. Bankruptcy Court for the Western District of Oklahoma to rescind the above referred[-]to assignments and conveyances and to assert my claim.

As he did with Matrix, Phyfer indicated to San Gabriel that he hoped to maintain the 1983 agreement in effect. Although he threatened to declare a forfeiture, Phyfer first offered San Gabriel the opportunity to comply with the terms of the 1983 contract. This offer "assume[d] the continued existence of the lease,"[17] and informed San Gabriel that, if it complied with the lease, Phyfer would not seek to regain ownership of the well and the agreement would remain in effect.

After the ten-day period had expired, Phyfer wrote the bankruptcy court that "I certainly feel that I have a legitimate claim [against Matrix for the well and that it] ... should rightfully be assigned to me." Phyfer, however, subsequently negotiated with

---

**13.** *See* Restatement (2d) Contracts § 84(b), p. 218.

**14.** *See* Restatement (2d) Torts § 894, pp. 381–82; Prosser, Torts § 105, pp. 733–34 (5th ed.).

**15.** *Williamson v. Metzger,* 379 So.2d 1227, 1231 (Miss.1980) (citing 58 C.J.S. § 184(b)(4), p. 396 (1948)); *Scruggs v. Clark,* 213 Miss. 290, 56 So.2d 805, 806 (1952); *Koenig v. Calcote,* 199 Miss. 435, 25 So.2d 763, 767 (1946); *see Young v. Amoco Production Co.,* 610 F.Supp. 1479, 1488–89 (E.D.Tex.1985), *aff'd,* 786 F.2d 1161 (5th Cir.1986); *Vickers v. Peaker,* 227 Ark. 587, 300 S.W.2d 29, 34 (1957); *Tenner v. Carmack,* 297 Ky. 847, 181 S.W.2d 455, 457 (1944); 3 Kuntz §§ 36.4(c)–(e) at 202–09; Summers § 470, pp. 374–82.

**16.** *See Metzger,* 379 So.2d at 1231; *Scruggs,* 56 So.2d at 806.

**17.** Summers § 440 at 75.

San Gabriel concerning the amount of royalties, thereby confirming San Gabriel's prior impression that it could still satisfactorily comply with the contract and maintain it in effect. Phyfer would have had no reason to request recognition of his royalty interest in October, 1986 and to negotiate the amount of that interest over the next several months had the lease already reverted to him. It was only in his complaint, filed on March 10, 1987, that Phyfer definitively indicated to San Gabriel that the agreement had terminated and that San Gabriel could no longer seek to comply with it.

By this late date, however, San Gabriel had already relied on Phyfer's solicitation of delay rentals and negotiation over royalties to conclude that it was still lessee of the Smith well under the 1983 agreement: since September, 1986, San Gabriel had been renovating and improving the well and its adjacent facilities, and by December of that year, San Gabriel had commenced production at the well. Having misled San Gabriel to its detriment to believe that the leases were in effect, thereby " 'permitting a continuance of the prosecution of the enterprise and the expending of money therein by the lessee,' " [18] Phyfer is estopped to assert months later that the leases were forfeited.[19] By offering to "accept[ ] performance which [wa]s not in strict compliance with the terms of the lease, [and] otherwise ... indulging the lessee, the lessor ... lull[ed] the lessee into a belief that his dereliction in carrying out his obligations under the lease has been condoned." [20] Estopped to seek a forfeiture of the leases, Phyfer may recover only the rental fees and royalty interest to which he is entitled under the 1983 agreement.

## IV.

The district court properly granted San Gabriel leave to amend its answer to Phyfer's complaint by adding, as an affirmative defense, that Phyfer was collaterally estopped to challenge the authority of the bankruptcy court to assign San Gabriel the well and leases. Phyfer had included in his complaint an exhibit mentioning the bankruptcy court's Order of Abandonment, and San Gabriel's failure to " 'comply precisely with [F.R.C.P.] Rule 8(c)' " by raising the affirmative defense belatedly " 'is not fatal' " because it did " 'not result in unfair surprise' " to Phyfer.[21] Neither our opinion nor the district court's opinion relies on the authority of the bankruptcy court to assign the Smith well to San Gabriel. They both rest on Phyfer's right to challenge the bankruptcy court order.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

18. *Metzger,* 379 So.2d at 1231 (citing 58 C.J.S. § 184(b)(4), p. 396 (1948)).

19. *Ibid.; Scruggs,* 56 So.2d at 806; *see Haby,* 228 F.2d at 307; Restatement 2d of Torts § 894, pp. 381–86; Prosser, Torts § 105, pp. 733–34.

20. 3 Kuntz § 36.4(e) at 208; *see* Summers, Oil and Gas § 470, pp. 374, 381–82; *Pfister v. Cow Gulch Oil Co.,* 189 F.2d 311, 314–15 (10th Cir.),

*cert. denied,* 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951); *cf. Metzger,* 379 So.2d at 1231; *Scruggs,* 56 So.2d at 806; *Young,* 610 F.Supp. at 1488–89.

21. *Bull's Corner Restaurant v. Director, Federal Emergency Management Agency,* 759 F.2d 500, 502 (5th Cir.1985) (citing *Allied Chemical Corp. v. Mackay,* 695 F.2d 854, 855 (5th Cir.1983)); *see* F.R.C.P. 8(c).