2017 ND 163

**Laurie A. ABELL, f/k/a Laurie A. Evans, individually and as Trustee of the**

**DDM Real Estate Trust, Plaintiff and Appellee**

v.

**GADECO, LLC, Defendant and Appellant**

**No. 20160346**

Supreme Court of North Dakota.

Filed 7/6/2017

Kaitlin A. DeCrescente (argued) and Peter H. Furuseth (on brief), Williston, ND, for plaintiff and appellee.

Monte L. Rogneby (argued) and Diane M. Wehrman (appeared), Bismarck, ND, for defendant and appellant.

VandeWalle, Chief Justice.

[¶ 1] GADECO, LLC, appealed from a judgment and orders declaring its oil and gas lease with Laurie Abell was terminated, dismissing its counterclaim against Abell, and awarding Abell her costs and attorney fees. We reverse and remand because there are genuine issues of material fact precluding summary judgment.

I

[¶ 2] On January 9, 2007, Abell entered into an oil and gas lease with GADECO. The lease gave GADECO the right to develop Abell's mineral interests on the subject property and:

[T]he right to store, treat, manufacture, refine, transport and market substances produced hereunder, and to lay pipe lines, build tanks, treating and manufacturing plants, gasoline recycling and repressuring plants, power houses and stations, telegraph and telephone lines, roads, canals, ditches, houses for employees and all other structures and facilities on the [Subject Property] necessary or convenient in the exercise of Lessee's rights hereunder.

The lease further provided:

[T]his lease shall remain in force for a term of five (5) years from [January 9, 2007,] called "Primary Term", and as long thereafter as either (1) oil, gas, or other minerals are produced ... from

the leased premises, or (2) operations are conducted on the leased premises, or (3) there is a well or wells on the leased premises which, although capable of producing oil, gas or other minerals in paying quantities hereunder is shut in for lack of a market or outlet. . . .

Operations as used herein means all operations for the drilling of a well for oil or gas, including building of roads, preparation of the drill site, moving in for drilling, drilling, deepening, plugging back, reworking or recompleting and also secondary recovery operations benefitting the leased premises.

[¶ 3] The Industrial Commission designated the subject property as part of a spacing unit in February 2011, and GADECO began planning wells for the spacing unit. GADECO entered into discussions with Abell about surface access to her property and she gave GADECO permission to survey and stake a portion of the property for a well location. GADECO did so on December 5, 2011, but Abell wanted GADECO to relocate the well site and it surveyed a new location and placed markers at the new site on December 15, 2011.

[¶ 4] GADECO and Abell began negotiating a surface use and damage agreement in mid-November 2011. GADECO sent Abell a proposed agreement on December 26, 2011, and later attempted to contact Abell about the agreement, but she refused to execute it. GADECO applied to the Industrial Commission for a well permit on January 6, 2012, shortly before the primary term of the lease was set to expire, and the permit was approved on January 23, 2012. On January 25, 2012, Abell leased the same mineral interests to Kodiak Oil & Gas. Unable to secure a surface use and damage agreement from Abell, GADECO relocated the well off the subject property but within the spacing unit,

and a producing oil and gas well was completed on May 23, 2013.

[¶ 5] After giving notice of termination, Abell brought this lawsuit seeking a determination that GADECO's lease had terminated and an award of costs and attorney fees under N.D.C.C. § 47–16–37. GADECO counterclaimed for breach of contract and damages. Through a series of summary judgment orders and a judgment not all of which are relevant to this appeal, the district court ruled the GADECO lease had terminated, dismissed GADECO's counterclaim, and awarded Abell her costs and attorney fees.

## II

[¶ 6] GADECO argues the district court erred in granting summary judgment declaring its lease with Abell had terminated at the end of its primary term.

[¶ 7] We have said summary judgment: is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether

the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

Krenz v. XTO Energy, Inc., 2017 ND 19, ¶ 17, 890 N.W.2d 222 (quoting *Riverwood Commercial Park v. Standard Oil Co.*, 2011 ND 95, ¶ 6, 797 N.W.2d 770).

[¶ 8] The district court's decision granting summary judgment is cryptic, providing no analysis or rationale. The court granted summary judgment "[b]ased upon the submitted Briefs and Supporting Documents as well as oral argument," concluded "the GADECO Lease between Plaintiff and Defendant has expired and its terms are no longer in force and effect," and ordered that "Defendant's interest in said GADECO Lease be deemed terminated and forfeited and the GADECO Lease released of record."

▮ [¶ 9] GADECO contends operations for the drilling of the well occurred before expiration of the primary term because it twice surveyed and staked well sites, applied to the Commission for a well permit, and was in active negotiations with Abell for a surface use and damage agreement. Abell relies on N.D. Admin. Code § 43–02–03–16, which requires an application for a well permit before "well-site preparation for the drilling of any well other than surveying and staking," can begin. Contrary to Abell's argument, this administrative regulation supports GADECO's argument that surveying and staking are necessary steps in preparing a well site.

[¶ 10] A substantial body of caselaw has developed defining the meaning of "drilling operations" for purposes of an oil and gas lease, and those decisions tend to define the phrase as broadly as the parties did in their lease agreement to include "preparation of the drill site." *See, e.g.*, 3 H. Williams and C. Meyers, *Oil and Gas Law*, § 618.1 (2016), and cases collected therein.

A North Dakota federal district court decision is instructive in determining what activities constitute the commencement of drilling operations. In *Anderson v. Hess Corp.*, 733 F.Supp.2d 1100, 1106 (D.N.D. 2010), *aff'd*, 649 F.3d 891 (8th Cir. 2011), the federal district court recognized that although this Court had not specifically interpreted the phrase "drilling operations," in *Serhienko v. Kiker*, 392 N.W.2d 808, 812 (N.D. 1986) we relied on principles for determining what constitutes "drilling operations" to decide what constitutes "reworking operations." The federal court explained:

"Drilling operations commence when (1) work is done preparatory to drilling, (2) the driller has the capability to do the actual drilling, and (3) there is a good faith intent to complete the well. It is not necessary that the drill bit actually penetrate the ground." *Murphy [v. Amoco Prod. Co.]*, 590 F.Supp. [455, 458 (D.N.D. 1984)] (internal citations omitted). The Alabama Supreme Court held in *Sheffield*, "The key element" in determining what constitutes drilling operations "is whether the operation is associated or connected with the physical site of the well or unit." *Sheffield [v. Exxon Corp.]*, 424 So.2d [1297, 1302 (Ala. 1982)].

In *Murphy*, the oil company had staked and surveyed the well location, obtained a drilling permit, worked on the access road, moved a rig onto the site, drilled a hole for the conductor pipe, and was within hours of spudding the well when it was forced to stop by a temporary restraining order. *Murphy*, 590 F.Supp. at 458. This Court held these activities constituted drilling operations that extended the lease beyond the primary term, noting, "[S]pudding is not the only act which triggers an automatic extension such as the one in this

lease. Defendant began sufficient preparatory acts a reasonable time before the expiration date." *Id.* at 459.

Courts in other jurisdictions have held activities similar to those conducted in *Murphy*, to constitute drilling operations. *See, e.g., Vickers v. Peaker*, 227 Ark. 587, 300 S.W.2d 29, 31–32 (1957) (surveying and clearing site, constructing road, obtaining permit, bringing material onto site); *Allen v. Cont'l Oil Co.*, 255 So.2d 842, 844–46 (La.Ct.App. 1971) (digging slush pit, building road, drilling hole for conductor pipe); *Johnson v. Yates Petroleum Corp.*, 127 N.M. 355, 981 P.2d 288, 290–91 (1999) (staking and surveying, obtaining permit, clearing site, working on road); *Guleke v. Humble Oil & Ref. Co.*, 126 S.W.2d 38, 41–42 (Tex.Ct.Civ.App. 1939) (beginning to erect derrick, bringing pipe, a drill for digging water well, and other materials onto site). Professor W.L. Summers' treatise on oil and gas law explains the general rule:

> The general rule seems to be that actual drilling i[s] unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease. If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts are unquestionable, and the court

may rule as a matter of law that the well was commenced within the time specified by the lease.

2 W.L. Summers, *Oil and Gas* § 349 (1959).

*Anderson*, at 1107–1108.

[¶ 11] The federal court determined the lessee, as a matter of law, had engaged in drilling operations sufficient to extend its leases beyond the primary term. *Anderson*, 733 F.Supp.2d at 1108. Before the end of the primary term, the lessee had "surveyed and staked a well, obtained a permit to drill . . ., leveled and lazered the pad, dug the drilling pit and lined it with gravel and clay, widened the access road to the well, drilled the rat hole for the main conductor pipe, moved equipment to the location, and drilled the mouse hole." *Id.* The federal court found the lessee's good-faith intent to complete the well was "evidenced by the fact the company completed the well on June 30, 2009, and the well has continuously produced." *Id.*

[¶ 12] Our caselaw in related contexts is in accord. *See Serhienko*, 392 N.W.2d at 813 (testing and other essential preparatory steps on the well site can constitute reworking operations if conducted in a bona fide effort to restore well to production as soon as possible); *Johnson v. Hamill*, 392 N.W.2d 55, 57 (N.D. 1986) (development and exploration are not carried out only by drilling operations, but by other activities such as geophysical surveys and farm-out operations). We have also generally treated similar determinations in related contexts as questions of fact. *See Greenfield v. Thill*, 521 N.W.2d 87, 92 (N.D. 1994) (whether a cessation of production in the secondary term terminates a lease is a question of fact); *Sorum v. Schwartz*, 411 N.W.2d 652, 654 (N.D. 1987) (failure to produce oil and gas is a question of fact subject to clearly erroneous rule);

*Hamill*, at 58 (whether prudent operator standard has been met is question of fact); *but see Serhienko*, at 814 (court erred as a matter of law in determining reworking operations were commenced within 60 days after production ceased).

 [¶ 13] Although GADECO's preparatory work for drilling was minimal, another principle must be considered in this case. Forfeitures of oil and gas leases are not favored, and one who invokes the jurisdiction of equity must come with clean hands. *See Sorum*, 411 N.W.2d at 654–655. "Where there is interference by the lessor with operations upon the premises during the term, the lessor is estopped to assert the termination of the lease for nonproduction." *Id.* at 655. One treatise explains:

> Where the failure to produce oil or gas from leased land is due to the fault of the lessor, the lease is not terminated at the end of the primary term, since the lessor is not entitled to set up termination of the lease where she has prevented the lessee from conducting operations which might bring about an extension of the lease. Thus, where the lessor refuses to give possession to the lessee, or where the lessor, claiming a forfeiture of the lease, obtains a wrongful injunction against the lessee, restraining operations on the land, the lease term will be extended beyond the date of its original expiration by the same length of time that the lessee was kept out of possession, or restrained from operations, by the wrongful act of the lessor.

2 *Summers Oil and Gas* § 14:22, at p. 281 (Rev. 3rd ed. 2016) (footnote omitted).

 [¶ 14] Here, GADECO has alleged that Abell thwarted its efforts to drill a well during the primary term of the lease. W. Gene Webb, GADECO's senior vice president, alleged in an affidavit that on November 15, 2011, after numerous attempts to contact Abell, GADECO obtained permission to survey the property for a well site. On December 5, 2011, GADECO had a proposed surface location for the well surveyed and staked in compliance with the required 500 foot setback, but Abell requested that the well location be moved because her nephew who lived nearby "did not want the drill rig in front of his home." GADECO "obliged and resurveyed and staked December 15, 2011, incurring additional costs." Between November 15, 2011 and January 13, 2012, GADECO negotiated with Abell for the execution of a surface use and damage agreement for the well. Webb attempted numerous phone calls to Abell to check on the status of the agreement and left voice messages, but Abell never returned the calls. During the last week of December 2011, Abell told Webb she wanted to have her nephew review the agreement which had been sent to her by electronic mail and she would call Webb back. After not receiving any return calls, Webb contacted Abell around January 5, 2012 and Abell told him she needed to have her attorney review the agreement. On January 6, 2012, Webb applied to the Industrial Commission for a drilling permit, requested expedited consideration, and also recorded notice that GADECO had commenced operations for drilling the well. On January 9, 2012, Webb asked Abell if she had heard back from her attorney, and Abell said she had not but would contact the attorney and respond. Abell did not respond, and when Webb contacted her on January 12, 2012 and asked whether she would approve the agreement, Abell informed him that GADECO's lease had expired and she would not extend the lease. Webb had the approved drilling permit cancelled because of Abell's refusal to sign or negotiate the surface use and damage agreement. GADECO eventually spud a

well on April 6, 2012 off of Abell's property and completed the well as a producer on May 23, 2013.

[¶ 15] GADECO's preparatory activities and the broad definition of "operations" in the parties' lease, considered together with GADECO's allegation that Abell frustrated its efforts to conduct operations within the primary term of the lease, create genuine issues of material fact that are not amenable to summary judgment disposition. Because there are genuine issues of material fact, we conclude the district court erred in granting summary judgment terminating the lease. As a result, we also reverse the award of costs and attorney fees under N.D.C.C. § 47–16–37.

### III

[¶ 16] GADECO argues the district court also erred in dismissing its claim for damages for breach of contract based on Abell's refusal to execute a utility easement so GADECO could install an electric distribution line to service the well.

[¶ 17] The district court ordered Abell to execute an easement for an electric distribution line to cross a portion of the subject property. In dismissing the damages claim, the court was equally terse:

> The Plaintiff has now executed an easement as ordered by the Court. The lease that was in effect is the Kodiak lease. If they wish to file suit for the delay in executing the easement, that is for another day. The issue for any damages based on the Kodiak lease is not properly before this Court.

[¶ 18] GADECO alleged in its counterclaim that Abell had refused to allow installation of an electric distribution line for the well in April 2015, causing it damages by unnecessarily increasing the costs of developing the spacing unit. The district court ordered Abell to execute the easement in February 2016. Abell contends GADECO sought damages only if she refused to execute the easement after the court ordered her to do so.

[¶ 19] The district court's decision is puzzling. It appears the decision might be based on its ruling that GADECO's lease had terminated, but we have reversed that ruling because factual disputes must be resolved. In any event, the decision does not explain why GADECO as the operator of the spacing unit could not claim damages for the period before the court ordered execution of the easement.

[¶ 20] We reverse the district court's dismissal of the breach of contract claim and remand for the court to clarify its decision or to reconsider it in view of its ultimate resolution of the lease termination issue.

### IV

[¶ 21] We reverse the judgment and orders and remand for further proceedings.

[¶ 22] Gerald W. VandeWalle, C.J.

Jerod E. Tufte

Daniel J. Crothers

Lisa Fair McEvers

William A. Herauf, D.J.

[¶ 23] The Honorable William A. Herauf, D.J., sitting in place of Kapsner, J., disqualified.